1

SUE ANN TINKEY

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

EASTERN DIVISION

CASE NO.: 3:05-cv-985-MEF

**ORIGINAL**

TROY E. TILLERSON,

    Plaintiff,

    V.

THE MEGA LIFE AND HEALTH INSURANCE CORPORATION, a corporation; TRANSAMERICA LIFE INSURANCE COMPANY F/K/A PFL LIFE INSURANCE COMPANY, a corporation; NATIONAL ASSOCIATION FOR THE SELF EMPLOYED A/K/A NASE, a corporation,

    Defendants.

S T I P U L A T I O N S

IT IS STIPULATED AND AGREED by and between the parties, through their respective counsel, that the deposition of SUE ANN TINKEY may be taken before STACEY L. JOHNSON, Commissioner, at the Offices of Nix, Holtsford, Gilliland, Higgins & Hitson, P.C., 4001 Carmichael Road, Suite 300, Montgomery, Alabama, on the 11th day of October, 2006.

HENDERSON & ASSOCIATES COURT REPORTERS, INC.
P. O. BOX 2263, MOBILE, AL 36652  (251)694-0950  (888)557-2969

Exhibit A

```
1      Q     How far did you go in school?
2      A     I graduated from high school and some
3   college.
4      Q     What?  General?
5      A     Real estate.
6      Q     Real estate courses?
7      A     Uh-huh.
8      Q     Where did you take the real estate
9   courses?
10     A     In San Diego.
11     Q     You can read and write?
12     A     Yes.
13     Q     I have to ask that question.
14     A     I know.  I know.  That's all right.
15     Q     Where are you currently employed?
16     A     I take care of Troy's paperwork for his
17  business, which is T&T Construction.  T&T
18  Construction.
19     Q     Who are the T and T in T&T?
20     A     Originally, it was Troy and his
21  brother, Floyd.
22     Q     Okay.
23     A     And then it became Troy and Gene, I
```

SUE ANN TINKEY

```
 1  guess, since Gene worked with him.
 2       Q    Now, Gene is Troy E. Tillerson?
 3       A    Yes.
 4       Q    The E for Eugene?
 5       A    Yes.
 6       Q    What type of construction business is
 7  T&T involved in?
 8       A    New homes, custom homes, and custom
 9  remodels.
10       Q    And you maintain the paperwork for the
11  business?
12       A    Yes.
13       Q    I guess office manager --
14       A    Yes.
15       Q    -- would be the appropriate title?
16       A    That's good.
17       Q    How long have you maintained the
18  paperwork for T&T Construction?
19       A    Probably 12 and a half years.
20       Q    Do you handle managing the financial
21  aspects --
22       A    Yes.
23       Q    -- of the company?
```

15

SUE ANN TINKEY

1  A    Yes.
2  Q    How long has Gene worked for T&T
3  Construction?
4  A    He started working with Troy when he
5  graduated from high school.
6  Q    Okay.  How long has -- has he been one
7  of the Ts -- one of the principals of T&T
8  Construction?
9  A    I don't know.
10 Q    Would there be any sort of paperwork --
11 A    No, no.
12 Q    Okay.  That's one other ground rule I
13 didn't cover.  Let me finish my question --
14 A    I'm sorry.
15 Q    -- before you answer, and I'll try to
16 let you finish your answer before I ask the next
17 question.  That way, we've -- we've got a
18 complete question and answer.
19      My question -- and I know you've
20 already said no -- would there be any sort of
21 paperwork that would evidence when Troy became
22 one of the principals in T&T Construction?
23 A    No.

SUE ANN TINKEY

```
 1  owner?
 2      A    Right.
 3      Q    Your son-in-law, Gene, who is Troy E.
 4  Tillerson, the plaintiff in this case, works for
 5  your husband?
 6      A    Basically, yes.
 7      Q    Okay.
 8      A    That's -- they're both considered
 9  independent contractors, you know.  I mean -- I
10  don't know.  It's hard -- I don't know how to
11  explain it other than the fact that they just
12  work side by side and they both have, you know,
13  specific things that they do, but there's no
14  formal partnership agreement.
15      Q    Okay.  How is Gene -- how does Gene get
16  paid?
17      A    How did he get paid when he was working
18  with Troy?
19      Q    Yes.
20      A    He was paid weekly.  And he also had
21  a -- he was in charge of the painting for the
22  jobs.  And when he was painting and not doing
23  carpentry work, he was paid through a draw for
```

```
1   the paint estimate for that job.
2       Q    Okay.  When you said he was paid
3   weekly, did he get a payroll check?
4       A    He received a check for -- we paid him
5   $600 per week.
6       Q    Okay.  Did you withhold --
7       A    We did not withhold.  He was
8   responsible for his own taxes.
9       Q    Okay.  Did you -- did T&T Construction
10  give him a 1099 at the end of the year?
11      A    No.
12      Q    And I understand -- I believe I recall
13  from Gene's deposition that he's no longer
14  working for your husband?
15      A    Correct.
16      Q    Okay.  When did he stop working for
17  your husband?
18      A    I believe he started with Ram Tool in
19  October of 2005.
20      Q    Why did he leave his employment at T&T
21  Construction?
22      A    Because of his health, he could no
23  longer do carpentry and painting work,
```

SUE ANN TINKEY

```
1      Q    Your husband and yourself?
2      A    Yes, yes.
3      Q    Okay.  Now, is that your personal
4   account, or is that a -- the account used for
5   the business?
6      A    Both.  It's combined.
7      Q    It's combined?
8      A    (Witness nods head.)
9      Q    And then we've got records from
10  SouthTrust for '03, '04, and '05?
11     A    Yes.
12     Q    Now, same thing.  Is -- I noticed on it
13  it's Troy M. Tillerson, Sue Tinkey, 459 Silver
14  Hill Road, Dadeville, Alabama?
15     A    Yes.
16     Q    Was this a joint account for you and
17  your husband?
18     A    Yes.
19     Q    Now, is this -- was this account also
20  used for the business?
21     A    Yes.
22     Q    Okay.  And I understand before your
23  deposition you told me that those records show
```

1  where premium payments and membership dues were
2  deducted from those -- those accounts?
3      A    Yes.
4      Q    And that would be for the policies of
5  insurance that we're here about that Gene
6  purchased back in the '90s?
7      A    Yes.
8      Q    Would you have other records -- bank
9  records that would go back beyond 2003 that
10 would show where there were deductions for
11 Gene's insurance from your husband's and your
12 account?
13     A    Yes.
14     Q    Okay.  And before the deposition, you
15 agreed to go back and look and provide Mr. Couch
16 with copies of those?
17     A    Yes.
18     Q    How would those membership -- or the
19 premiums -- how would they be reflected on one
20 of the statements?
21     A    As an automatic deduction.
22     Q    Does it indicate who the deductor was?
23     A    NASE.

SUE ANN TINKEY

1  Q  NASE. So where -- when we look through
2  there and we see NASE, that would be where your
3  husband and your account was deducted for that
4  charge?
5  A  Yes.
6  Q  And this was to pay for Gene's
7  insurance coverage?
8  A  Yes, yes.
9  Q  Okay. Were you and your husband
10 reimbursed for -- by Gene for the moneys that
11 were taken out of your account?
12 A  No.
13 Q  Okay. You and your husband paid for
14 it?
15 A  It was -- in the -- initially in '96
16 when we got the insurance, we decided that we
17 would give him health insurance in lieu of an
18 increase in pay.
19 Q  Okay.
20 A  And we had the -- we paid the premiums
21 and had them deducted from our account so that
22 we would know they'd be paid and he was covered
23 for health insurance.

1    Q    So whenever the decision was made to
2   purchase health insurance, your husband and you
3   made a decision as the employer for Gene to give
4   him health insurance instead of a raise?
5    A    Correct.
6    Q    And since that time, the business has
7   paid the premiums for Gene?
8    A    Troy -- yes.  Troy M. has paid the
9   premiums.
10   Q    Okay.
11   A    Yes.  And he is the business.
12   Q    He's a sole proprietor?
13   A    Right.
14   Q    And Gene worked for him?
15   A    Right.
16   Q    Okay.
17   A    Basically.
18   Q    And that's been during the entire time
19   that Gene has had the MEGA policy T&T
20   Construction has paid the premiums?
21   A    Yes.
22   Q    Has T&T Construction taken a deduction
23   on its tax returns for those premiums?

```
 1          THE WITNESS:  Uh-huh.
 2      Q   Is there any sort of written memo or
 3  note or anything that would reflect the decision
 4  by your husband as Gene's employer to provide
 5  health insurance benefits to him?
 6      A   No.
 7      Q   You just made that decision and
 8  instituted it?
 9      A   Yes.
10      Q   And as the -- I guess as the office
11  manager, you were fully aware of that decision
12  and you took steps to implement it to provide
13  health insurance benefits for --
14      A   Yes.
15      Q   -- Gene as an employee?
16      A   Yes.
17      Q   Before the policy we're here about was
18  purchased, was there any insurance provided to
19  Gene through his employment with your husband?
20      A   No.
21      Q   Has your husband through the -- through
22  the operation of his business bought health
23  insurance on himself?
```

1  basically the one that set up --
2      A    Yes.
3      Q    -- getting him coverage?
4      A    Yes.
5      Q    Tell me how that -- tell me how this
6  came about, this decision to provide Gene with
7  coverage.  Was there a discussion between you
8  and your husband, Troy?
9      A    Yes.
10     Q    Tell me what you recall about that
11 discussion.
12     A    Well, I -- I don't remember how I found
13 out about the NASE insurance.  It was a magazine
14 article or TV or whatever.  And I had signed up
15 for this insurance.  And I was happy with it at
16 the time, and so I said to Troy, I said, you
17 know, what are we going to do about Gene and his
18 health insurance, he needs to have some health
19 insurance, he's getting older.  So we decided we
20 would provide him with health insurance in lieu
21 of a raise.  And I contacted the agent that had
22 sold me the insurance and set up a time for Gene
23 to come and meet with him, and we signed him up.

SUE ANN TINKEY

1    Q    Okay.  So after you and your husband,
2  Troy, talked about it and the decision was made
3  to provide Gene with insurance in lieu of the
4  raise, you contacted the agent you had dealt
5  with --
6    A    Uh-huh.
7    Q    -- and talked to Gene and set up a
8  meeting --
9    A    Right.
10   Q    -- so the agent could explain the
11 coverage to Gene?
12   A    Right.  Right.
13   Q    Where did that meeting occur?
14   A    At our home on Silver Hill Road.
15   Q    Who was the agent?
16   A    Dan Splawn.
17   Q    Who was present during the meeting
18 between Gene and Dan Splawn?
19   A    It was myself and Gene and Dan Splawn.
20   Q    Okay.  Was your husband in the meeting
21 at all?
22   A    No, he was not there.
23   Q    Do you recall what Dan said about the

1  coverage that he was selling to Gene -- or
2  selling for Gene?
3      A    Yes.
4      Q    What did he tell you?
5      A    We went over, you know, the benefits of
6  what -- of what was going to be provided, and
7  because this was a group policy, then we would
8  have much better rates.  And it would just be
9  a -- you know, like your standard group policy
10 as if you were working for a large company.
11     Q    Okay.  Anything else you can remember?
12     A    No.
13     Q    And at some point, the application was
14 completed; correct?
15     A    Yes.
16     Q    At that time, was it set up to where
17 the money would come out of T&T's bank account?
18     A    Yes.  Troy's, yes.
19     Q    Okay.  I'll show you what I'm going to
20 mark as Exhibit 2 to your deposition.
21
22     (Whereupon, Defendants' Exhibit
23 Number 2 was marked for identification

1  lower premium but a higher deductible; correct?
2      A    Correct.
3      Q    Okay.  I'm going to show you what was
4  Exhibit 6 to Gene's deposition.
5      A    (Witness reviews document.)
6      Q    Do you recognize that document?
7      A    Yes.
8      Q    This is a letter dated December 20,
9  1999, and it reflects that the premium is going
10 to increase to 331; correct?
11     A    Yes.
12     Q    Let me ask you this.  After this
13 increase, did you have any conversations with
14 anybody at PFL or MEGA or NASE or any other of
15 the defendants regarding this increase?
16     A    No.
17     Q    Did your husband -- you and your
18 husband continue to pay the premiums?
19     A    Yes.
20     Q    Let me show you what was Exhibit 7 to
21 Troy's -- or to Gene's deposition.  And this is
22 a letter dated June 19, 2000, and it reflects
23 that the premium is going to increase to $353;

53

SUE ANN TINKEY

1   correct?
2       A    Yes.
3       Q    Do you recall receiving that letter?
4       A    Yes.
5       Q    Okay. Did you and your husband
6   continue to pay the premiums for Gene in lieu of
7   a raise?
8       A    Yes.
9       Q    Did you have any conversations with
10  anybody at PFL or MEGA or any of the defendants
11  concerning this increase?
12      A    No.
13      Q    If you look -- look on the back of that
14  one.
15      A    (Witness complied.)
16      Q    You see there's a place where it says
17  other options to lower your premium may be
18  available to you. Our customer service
19  representatives will be happy to review all
20  available options with you at your convenience.
21  And then it's got a place to please change my
22  option to blank. Was there any consideration to
23  changing the plan to lower the premiums that

```
 1  him and stress him any further.
 2      Q    Now, when these increases occurred, did
 3  your husband, Troy, continue to pay the premiums
 4  for Gene?
 5      A    Yes.
 6      Q    Okay.  So even the increases were not
 7  passed on to Gene to pay?
 8           MR. COUCH:  Object to the form.
 9      Q    You -- you never got to a point where
10  Gene said -- where your husband said, okay,
11  Gene, I'm going to pay -- I'll go to five --
12  I'll go to 400 a month, but I'm not going above
13  400 a month; if it increases above 400, you're
14  going to have to pay the balance?
15      A    No.  Just Gene just never received any
16  increase in pay from -- over the 13 years, he
17  has increased his pay by a hundred and fifty
18  dollars a week, I think, but he never received
19  any further pay increases.
20      Q    So he was basically getting the -- the
21  premium increases in lieu of -- of a raise?
22      A    Correct.  Basically, yes.  We couldn't
23  really afford to increase it any more.
```