```
00001
 01        IN THE UNITED STATES DISTRICT COURT
 02          FOR THE MIDDLE DISTRICT OF ALABAMA
 03                   EASTERN DIVISION
 04    CASE NO. 3:05-cv-985-MEF
 05
 06    TROY E. TILLERSON,
 07            Plaintiff,
 08                  V.
 09    THE MEGA LIFE AND HEALTH INSURANCE CORPORATION,
 10    a corporation; TRANSAMERICA LIFE INSURANCE
 11    COMPANY, F/K/A PFL LIFE INSURANCE COMPANY, a
 12    corporation; NATIONAL ASSOCIATION FOR THE SELF
 13    EMPLOYED A/K/A NASE, a corporation,
 14            Defendants.
 15
 16            S T I P U L A T I O N S
 17       IT IS STIPULATED AND AGREED by and between
 18    the parties, through their respective counsel,
 19    that the deposition of TROY E. TILLERSON may be
 20    taken before STACEY L. JOHNSON, Commissioner, at
 21    the Offices of Hollis & Wright, P.C., 505 North
 22    20th Street, Suite 1750, Birmingham, Alabama, on
 23    the 24th day of April, 2006.
00002
 01            IT IS FURTHER STIPULATED AND AGREED
 02    that the signature to and the reading of the
 03    deposition by the witness is hereby waived, the
 04    deposition to have the same force and effect as
 05    if full compliance had been had with all laws
 06    and rules of Court relating to the taking of
 07    depositions.
 08            IT IS FURTHER STIPULATED AND AGREED
 09    that it shall not be necessary for any
 10    objections to be made by counsel to any
 11    questions except as to form or leading
 12    questions, and that counsel for the parties may
 13    make objections and assign grounds at the
 14    time of trial, or at the time said deposition is
 15    offered in evidence, or prior
 16    thereto.
 17            IT IS FURTHER STIPULATED AND AGREED
 18    that the notice of filing of the deposition by
 19    the Commissioner is waived.
00003
 01                      INDEX
 02    EXAMINATION BY:                    PAGE NUMBER:
 03    Mr. Lampkin................................5-80
 04
 05    EXHIBITS:
 06    Defendants' Exhibit 1.........................27
 07       (Certificate Schedule)
 08    Defendants' Exhibit 2.........................29
 09       (excerpt from insurance policy)
 10    Defendants' Exhibit 3.........................47
 11       (letter dated 12-28-98)
 12    Defendants' Exhibit 4.........................50
```

13      (letter dated 6-21-99)
14  Defendants' Exhibit 5.........................53
15      (letter dated 6-28-99)
16  Defendants' Exhibit 6.........................54
17      (letter dated 12-20-99)
18  Defendants' Exhibit 7.........................55
19      (letter dated 6-19-2000)
20  Defendants' Exhibit 8.........................58
21      (letter dated 12-26-2000)
22  Defendants' Exhibit 9.........................59
23      (letter dated 6-25-2001)
00004
01                  INDEX (continued)
02  Defendants' Exhibit 10........................60
03      (letter dated 12-24-2001)
04  Defendants' Exhibit 11........................61
05      (letter dated 6-24-2002)
06  Defendants' Exhibit 12........................63
07      (letter dated 12-26-2002)
08  Defendants' Exhibit 13........................64
09      (letter dated 6-23-2003)
00005
01              A P P E A R A N C E S
02
03      HOLLIS & WRIGHT, P.C., by Mr. Steven W.
04  Couch, 505 20th Street North, Suite 1750,
05  Birmingham, Alabama 35203, appearing on behalf
06  of the plaintiff, Troy E. Tillerson.
07
08      ALFORD, CLAUSEN & McDONALD, LLC, by
09  Mr. James W. Lampkin, II, One St. Louis Centre,
10  Suite 5000, Mobile, Alabama 36602, appearing on
11  behalf of the defendants, The MEGA Life and
12  Health Insurance Company, Transamerica Life
13  Insurance Company, and National Association for
14  the Self-Employed, Inc.
15
16  ALSO PRESENT:  MR. BEN WILLIAMS (videographer)
00006
01      I, STACEY L. JOHNSON, a CSR of Montgomery,
02  Alabama, and Notary Public for the State of
03  Alabama at Large, acting as Commissioner,
04  certify that on this date, as provided by the
05  Alabama Rules of Civil Procedure and the
06  foregoing stipulation of counsel, there came
07  before me at 505 20th Street North, Suite 1750,
08  Birmingham, Alabama, beginning at 10:06 a.m.,
09  TROY E. TILLERSON, witness in the above cause,
10  for oral examination, whereupon the following
11  proceedings were had:
12              TROY E. TILLERSON,
13  the witness, after having been first duly sworn
14  to speak the truth, the whole truth, and nothing
15  but the truth, testified as follows:
16              EXAMINATION
17  BY MR. LAMPKIN:
18      Q    State your full name for the Record,

```
19  please.
20      A    Troy Eugene Tillerson.
21      Q    My Tillerson, my name is James Lampkin,
22  and I represent -- who do I represent --
23  MEGA Life Health, Transamerica, and The National
00007
01  Association for the Self-Employed in a lawsuit
02  that you filed.
03      A    (Witness nods head.)
04      Q    I've got some questions to ask you.  If
05  at any time you do not understand my question,
06  please stop me, ask me to rephrase it, explain
07  it, make it more understandable, and I'll be
08  glad to do so.
09      A    Okay.
10      Q    Okay.  You're going to need to speak
11  up.  We've got some background noise of somebody
12  hammering on something.  And I'm getting a
13  little -- in my old age getting a little harder
14  of hearing, so I'm going to need you to speak up
15  so we make sure that everybody hears
16  everything.
17          If I ask you a question and you don't
18  ask me to explain it, rephrase it, make it more
19  understandable, I'm going to assume that you
20  heard the question, you understood the question,
21  and that your answer is the correct answer to
22  that question; is that fair?
23      A    Yes, sir.
00008
01      Q    And you don't have to call me sir.  Yes
02  and no is fine.
03          Are you currently on any type of
04  medications that would affect your ability to
05  sit in this deposition and listen and understand
06  the questions I have to ask?
07      A    No.
08      Q    Do you have any sort of medical
09  condition that would affect your ability to sit
10  in this deposition, listen to the question --
11  listen and understand the questions I have to
12  ask?
13      A    No.  The only thing is I have to go to
14  the little boys room a lot because of my
15  hyperactive thyroid so I may have to do that,
16  but other than that, we're good.
17      Q    Okay.  That brings me to another
18  point.  If at any time you need to take a break,
19  you let me know and we'll be glad to take a
20  break.  Okay?
21      A    Okay.
22      Q    A lot of times whenever we sit and look
23  at each other and we talk and we -- we
00009
01  communicate non-verbally.  We might shake our
02  head or nod our head.  That makes the court
03  reporter's job harder.  So I need a verbal
```

```
04   response, yes or no.  Please don't say uh-huh or
05   huh-uh because when I go back and read -- read
06   it in the printed transcript, I've got to try to
07   figure out, okay, which one is this, and it just
08   makes things a little more difficult for me.  It
09   doesn't make the court reporter's job that much
10   harder, but it makes my mine.  Like I said, if
11   you need a break, let me know.  The deposition
12   will probably take a couple of hours.
13      A    Okay.
14      Q    We're doing a good job of not talking
15   at the same time.  Please let me finish my
16   question before you start your answer, and that
17   way we don't talk over each other.  And it makes
18   the court reporter's job harder.  And I'll do
19   the same thing.  I'll let you finish your answer
20   before I ask the next question.  Okay?
21      A    Okay.
22      Q    What's your home address?
23      A    1617 Sandstone Court.
00010
01      Q    Is that one or two words or three
02   words?
03      A    One.  Well, Sandstone is one word.
04      Q    Okay.  Is that in Birmingham?
05      A    Montgomery, Alabama.
06      Q    Montgomery.
07      A    36117.
08      Q    What part of Montgomery is that in?
09      A    It's in the Woodmere area.
10      Q    Out -- that's out 85 and the bypass
11   area?
12      A    Yes, sir.
13      Q    How long have you lived at that
14   address?
15      A    Six years, I believe.
16      Q    Who lives at that address with you?
17      A    No one.
18      Q    Are you currently married?
19      A    No.
20      Q    Have you ever been married?
21      A    No.
22      Q    Who are your relatives that live in the
23   Montgomery area?
00011
01      A    (No response).
02      Q    Let me ask you this.  Do your mother
03   and father still live there?
04      A    No.
05      Q    Do you have any brothers and sisters
06   that live in the Montgomery area?
07      A    No.
08      Q    Do you have any aunts and uncles that
09   live in the Montgomery area?
10      A    Sue Murchison.
11      Q    Murchison, M-U-R-C-H-I-S-O-N?
12      A    Yes, sir.
```

```
13    Q    Okay.  And that's an aunt?
14    A    Yes.
15    Q    Is she married?
16    A    No.
17    Q    Okay.  Does she have any -- do you have
18 any cousins that live in the Montgomery area?
19    A    Her daughter, Susan.
20    Q    Susan?
21    A    And I don't remember her last name.
22 She's gotten married and -- we're real close.
23    Q    I went to school -- I grew up in
00012
01 Montgomery and went to a school with a boy named
02 Paul Murchison.
03    A    No.
04    Q    He was a punter on our football team.
05         Any other relatives that you have in
06 the Montgomery area?
07    A    My aunt, Judy Dubose, my mom's sister.
08    Q    Okay.  Is she married?
09    A    Yes.
10    Q    What's her husband's name?
11    A    Jerry.
12    Q    Do they have any children over the age
13 of eighteen that live in the Montgomery area?
14    A    No.
15    Q    The reason I'm asking these questions
16 is because when we go to select a jury, I would
17 -- it wouldn't be fair for my client to have
18 your relatives on the potential jury.  Likewise,
19 it wouldn't be fair for you to have relatives of
20 some of the people that I represent on the
21 jury.
22    A    I understand.
23    Q    And that's why I'm trying to find out.
00013
01         Do you have any other relatives that
02 live in the Montgomery area?  In the Montgomery
03 area I'm including Prattville, Wetumpka,
04 Montgomery, Bullock.
05    A    Yes.  Pat Murchison is in Wetumpka,
06 yes.
07    Q    How are you related to Pat Murchison?
08    A    He's my cousin.
09    Q    Is Pat married?
10    A    Yes.
11    Q    Do you know his wife's name and maiden
12 name?
13    A    Her first name is Kelly.  I have no
14 idea what her maiden name is.
15    Q    Do they have any children over the age
16 of eighteen that live in that Montgomery area?
17    A    Not that I know of.  I think Megan is
18 sixteen, so I think that's the oldest one.
19    Q    Have we covered all of your relatives
20 that you have that live in the Montgomery area?
21    A    I believe so.  Yes, sir, I think so.
```

```
22      Q     How far did you go in school?
23      A     I graduated.
00014
01      Q     Okay.  Where from?
02      A     Jeff Davis.
03      Q     What year?
04      A     '81.
05      Q     Did you attend college?
06      A     No, sir.
07      Q     Since graduating high school, have you
08 had any other formal type of education, whether
09 trade school, vocational?
10      A     Well, computer training at Coastal in
11 Montgomery.
12      Q     What was the name of the place?
13 Coastal?
14      A     Coastal.  And then --
15      Q     When did you take the computer
16 training?
17      A     Let's see.  '83, '84.  Something like
18 that.  Man, that's been so long ago.
19      Q     Any other formalized schooling other
20 than Coastal?
21      A     No, sir.
22      Q     Can you read and write?
23      A     Yes, sir.
00015
01      Q     Where are you currently employed?
02      A     Ram Tool.
03      Q     What's your position at Ram Tool?
04      A     Inside sales.
05      Q     Where is that located?
06      A     541 Oliver Road, Montgomery, Alabama.
07      Q     What part of Montgomery is that?
08      A     Off the Eastern Bypass.  Its ZIP code
09 is 36117.  I'm trying to think of the -- I guess
10 you would just call it Montgomery East.
11      Q     Okay.  How long have you been employed
12 there?
13      A     Since October 10th.
14      Q     Of 2005?
15      A     Yes.
16      Q     Where were you employed before Ram
17 Tool?
18      A     I was self-employed.
19      Q     What was the nature of your
20 self-employment?
21      A     I did construction work and also custom
22 paint work.
23      Q     Did your company have a name?
00016
01      A     Prestige Paint Works and T&T
02 Construction.
03      Q     Were they both in operation at the same
04 time?
05      A     Yes, sir.
06      Q     I got Prestige Paint Works.  What was
```

```
07  the name of the construction?
08       A     T&T.  Not like dynamite, but T&T.
09       Q     I was hearing TNT.  T&T?
10       A     Right.
11       Q     Did you have any business partners or
12  anything with either one of them?
13       A     Well, not really.  We worked together
14  all the time, you know, with the same subs and
15  stuff like that, but we weren't really partners,
16  so to speak.  Worked, you know, with my father,
17  you know, side-by-side kind of thing, but I
18  wouldn't call it partners.
19       Q     Okay.  How long were you self-employed?
20       A     The best I remember about twenty-three
21  years.
22       Q     Did you work primarily in the
23  Montgomery area?
00017
01       A     Montgomery and Lake Martin area.
02       Q     What did you do before you became
03  self-employed with Prestige and T&T
04  Construction?
05       A     I did some work at Ebco Battery when I
06  was young, right out of school.
07       Q     What did you do at Ebco Battery?
08       A     I guess just general labor you'd say,
09  loaded the trucks, you know, got shipments
10  ready, that kind of stuff.  You know, just
11  basic...
12       Q     How long were you employed there?
13       A     Maybe a year and a half to the best I
14  remember.  It wasn't a long time.
15       Q     Okay.  Any other employment?  If you
16  worked at McDonald's or something like that when
17  you were in high school, I'm really not all that
18  concerned about that.
19       A     Okay.  I did a little temporary stint
20  with the State way back when I was young, just
21  when they needed temporary help.
22       Q     What kind of work were you doing?
23       A     Just working the tax warehouse.  You
00018
01  know, moving files and stuff like that.  Nothing
02  to really amount to anything.
03       Q     Before you purchased the policy that
04  we're here about in the lawsuit, did you have
05  any sort of health insurance previously?
06       A     No, sir.
07       Q     With your position with Ram Tool is
08  health insurance one of the benefits you
09  currently have?
10       A     Yes.
11       Q     Are you covered by that insurance?
12       A     Well, I have, you know, the waiting
13  period beforehand, so I think I've still got --
14  let's see.  October.  So I've still got quite a
15  few months before it completely kicks in, but,
```

```
16  yes, I'll be using that as soon as it kicks in,
17  BlueCross BlueShield.
18      Q    Okay.  That's BlueCross BlueShield?
19      A    Yes, sir.
20      Q    And you've been on that since October
21  of 2005 when you went to work with Ram Tool?
22      A    Well, yes, sir.
23      Q    Subject to the --
00019
01      A    Right.  Right.
02      Q    -- waiting period?
03      A    Right.
04      Q    Are you having to pay any part of the
05  premiums on that coverage?
06      A    Well, yes, sir.  They take it out of my
07  check.
08      Q    How much do they take out?
09      A    I don't know exactly.  If I'm not
10  mistaken, it's about a hundred and thirty,
11  hundred and forty a month.  Something like
12  that.  I'm not exactly sure.
13      Q    Do you know how much Ram Tool pays of
14  your insurance premium?
15      A    No, sir.
16      Q    Tell me how you came to purchase the
17  policy at issue in this case.  How did that come
18  about?
19      A    Sue Tinkey, who handled all the
20  paperwork for the construction and the paint
21  business, stuff like that, she was just
22  concerned that I needed to get some coverage,
23  and she called me up one day.  And I -- I don't
00020
01  know whether she had saw it in a magazine or saw
02  it on TV or what, but she had gotten in touch
03  with the agent.  And she told me, she said, you
04  know, I think you need to meet with him up here
05  and, you know, let's get you some health
06  insurance.  So I met with him and just got
07  signed up.
08      Q    Who is Sue Tinkey?
09      A    Sue Tinkey is my father's common-law
10  wife.
11      Q    How long have you known Sue Tinkey?
12      A    Gosh, I don't know exactly, but I would
13  say around fifteen years or so.  Maybe longer.
14      Q    Because you purchased this policy, I
15  believe, almost ten years ago.  Back in 1996, I
16  believe.
17      A    That sounds about right, then.  About
18  fifteen years, I believe.
19      Q    So was Sue handling the paper -- you
20  said she was handling the paperwork.  Was she
21  handling the paperwork for your self-employed
22  business?
23      A    Right.  Right.  She -- she pretty much
00021
```

```
01  acted like a secretary for both me and my
02  father.
03      Q    Is she -- and is Sue and your father
04  still together?
05      A    Yes.
06      Q    What's her address?
07      A    459 Silver Hill Road, Dadeville,
08  Alabama 36853, I believe.  I'm not exactly sure.
09      Q    Now, is Dadeville up around Lake
10  Martin?
11      A    Yes, sir.
12      Q    So Sue tells you she's set up -- she's
13  contacted somebody and set up a meeting for you;
14  right?
15      A    Right.
16      Q    To talk to somebody about health
17  insurance?
18      A    Yes, sir.
19      Q    Do you remember the name of the person
20  you talked to?
21      A    Dan Spawn (sic), or something like
22  that.
23      Q    Where did that meeting occur?
00022
01      A    At my father's house.
02      Q    Who was present at the meeting?
03      A    My father, Sue, myself, and Mr. Spawn.
04      Q    I didn't -- what's your father's name?
05      A    Troy Tillerson.
06      Q    Are you a junior or --
07      A    No, sir.  He's Troy M.  I'm Troy E.
08      Q    Okay.  So it was you, your father?
09      A    Sue.
10      Q    Sue.
11      A    And Mr. Spawn.
12      Q    Were Sue and your father in the room
13  when Mr. Spawn was talking to you about the
14  coverage?
15      A    Sue was the whole time.
16      Q    So your father may have been in and
17  out?
18      A    Yes, sir.  You know, going to take a
19  shower.  That kind of stuff, you know.
20      Q    Tell me what you recall Mr. Spawn
21  telling you about the policy he was presenting
22  to you.
23      A    Well, the best I remember -- you know,
00023
01  it's been a -- been a while back -- he was just
02  basically showing me, you know, the benefits of
03  it.  And by the fact that it was a group policy
04  based off of all -- I mean, not unemployed --
05  self-employed individuals in the state of
06  Alabama, he was explaining to me that's how they
07  kept their rates low and that type of stuff.
08  And, you know, basically that kind of thing.
09      Q    Do you recall anything else he told you
```

```
10  about?  Do you recall any specifics of what he
11  told you about the benefits available under the
12  policy?
13       A    Let me think.  Like I said, it's been
14  so long ago.  He pointed out that you couldn't
15  be singled out for rate increases.  He said
16  that, you know, later if I were to get married
17  and that kind of thing, my wife could get on.
18  You know, she would automatically qualify.
19  That -- that type of stuff.  Like I said, you
20  know, it's been so long I -- I couldn't tell you
21  word for word what he said.
22       Q    Okay.  I don't know the exact date.  I
23  know the effective date of the policy was July
00024
01  26th of 1996, so we're pretty close to ten years
02  ago.
03       A    Yes.
04       Q    Nine years.  Nine --
05       A    That's a long time ago.
06       Q    -- and three quarter years out.
07            How long did the meeting last?
08       A    The best I can remember, about an hour,
09  hour and a half at the most.
10       Q    Let me ask you this.  At that time, did
11  Sue purchase any coverage from Mr. Spawn?
12       A    I don't know.
13       Q    Okay.
14       A    I just -- I don't know if she did or
15  not.
16       Q    What about your father?  Did he
17  purchase any coverage?
18       A    No.
19       Q    Do you know if your father already had
20  coverage from the same insurance company?
21       A    No.  He's with -- had
22  BlueCross BlueShield since he was with the fire
23  department.
00025
01       Q    What about Sue?  Do you know if she had
02  any coverage?
03       A    I have no idea about Sue.
04       Q    Do you know anybody else that has
05  coverage from -- I believe it's PFL the policy
06  is written on.  Do you know of anybody else who
07  has a policy --
08       A    No, sir.
09       Q    -- like yours?
10       A    No, sir.
11       Q    After this meeting with Mr. Spawn, did
12  you have any subsequent meetings with him?
13       A    No, sir.
14       Q    Did you ever talk to him again?
15       A    No, sir.
16            MR. COUCH:  James, I don't mean to
17  interrupt you.  This guy's name is -- according
18  to your Rule 26 stuff is Splawn, S-P-L-A-W-N.
```

```
19  Dan Splawn.  Just so that reads right.
20          MR. LAMPKIN:  Yeah, I thought that was
21  right, but...
22      Q    So after Mr. Splawn leaves that day,
23  you haven't had any other conversations with him
00026
01  about your policy?
02      A    No, sir.
03      Q    Have you had any conversations with him
04  about any rate increases?
05      A    No, sir.  I've never spoke to him
06  again.
07      Q    What did Mr. Splawn tell you the
08  premiums would be on your policy?
09      A    I don't remember.
10      Q    In the complaint, there's an allegation
11  that you were told that it was a, quote, major
12  medical, closed quote, policy.  Do you recall
13  that term being used?
14      A    To the -- to the best of my knowledge,
15  yes.  It -- it was supposed to take care of all
16  that type of stuff.
17      Q    Okay.  Well, let's look at what we're
18  going to -- what's your understanding -- what
19  was your understanding in 1996 of what a major
20  medical policy was, or did you have an
21  understanding?
22      A    Well, to me, that, you know, meant that
23  any illnesses, hospital visits, you know,
00027
01  that -- that type of stuff would be, you know,
02  took care of and -- you know, like I said, I --
03  I'm just talking off what I can remember from
04  that long ago, so...
05      Q    Yes, sir.
06      A    You know.
07
08      (Whereupon, Defendants' Exhibit
09  Number 1 was marked for identification
10  and copy of same is attached hereto.)
11
12      Q    I'm going to show you what I'm marking
13  as Exhibit 1.  It consists of two pages.  It
14  would be Exhibit 1 to your deposition.  And this
15  would be a Certificate Schedule.
16      A    (Witness reviews document.)
17      Q    Did you -- after you purchased the
18  policy, did you receive the policy itself?  Did
19  you get a copy of your policy in the mail?
20      A    It was sent to my father's house, and
21  Sue gave it to me, yes.
22      Q    Okay.  So you -- at some point in 1996,
23  you will agree that you received the policy?
00028
01      A    Yes, sir.
02      Q    So you've had that policy in your
03  possession to this date; is that right?  Unless
```

04  you gave it to your attorney?
05      A    Well, I -- I gave it back to Sue.  I
06  don't know if she gave it to Mr. Couch or not.
07      Q    Okay.  Do you remember when you -- do
08  you know when you gave the policy to Sue?
09      A    It was shortly after she gave it to
10  me.  I, you know, just looked through it.  I
11  mean, what little I could understand from, you
12  know, all that insurance jargon, you know.  I
13  basically just saw that I had it and let her
14  have it back.  She keeps, like I said, most all
15  the records.
16      Q    When you looked through the policy in
17  1996 after you received it, did you have any
18  question or concern about the policy you
19  purchased?
20      A    At that time, no.
21      Q    If you look at it in what I've marked
22  as Exhibit 1, it's got a schedule of benefits
23  payable.  Then it's got both in network and out
00029
01  of network.  You come down, and you've got
02  out-of-pocket maximums.  Then you've got
03  coinsurance and things like that that are
04  listed.
05           Did you review that whenever you looked
06  at the policy?
07      A    To be honest, I don't remember.
08      Q    That's fair.  I'm going to show you
09  what we're going to mark as Exhibit 2 to your
10  deposition.  And this is a part of the policy.
11
12      (Whereupon, Defendants' Exhibit
13  Number 2 was marked for identification
14  and copy of same is attached hereto.)
15
16           MR. COUCH:  So we're clear, Exhibit 1
17  are pages 8 and 9 that are the bottom of the
18  page, right-hand corner?
19           MR. LAMPKIN:  Yeah.  I -- let me
20  identify.  Exhibit 1 consists of Bates labels
21  TI300011 and 12.  Exhibit 2 is TI3000 -- that's
22  three zeros -- 23, just for the Record.
23      Q    And -- and I'll -- Mr. Tillerson, I'll
00030
01  represent this is actually a part of the policy
02  that would have been provided to you.  You see
03  down at the bottom it says Premium Changes?
04      A    Uh-huh.
05      Q    Tell me if what I read is correct.  We
06  reserve the right to change the table of
07  premiums on a class basis becoming due under the
08  group policy at any time and from time to time
09  provided we have given the group policyholder
10  written notice of at least 31 days prior to the
11  effective date of the new rates.  Is that what
12  that says?

```
13    A    Uh-huh.  Yes, sir.
14    Q    Can you understand that's saying the
15 company reserves the right to the change
16 premium?
17    A    Yes.
18    Q    And if you would have read that back in
19 1996, you would have known that the company had
20 the right to change the premiums; right?
21    A    Yes.
22    Q    You said that Mr. Splawn said you
23 couldn't be singled out for a rate increase.
00031
01 What did he say -- what did he tell you in
02 regard to that?
03    A    Well, he told me that since it was a
04 group policy, that no one person could be
05 singled out.  That if a rate increase occurred,
06 it would be across the board.
07    Q    Okay.  In other words, you couldn't --
08 you yourself wouldn't be the only one that would
09 get a rate increase?
10    A    Exactly.
11    Q    And this conversation occurred when you
12 met with him back in 1996?
13    A    Yes, sir.
14    Q    In your complaint, you have made
15 allegations that -- let me find it so I'll make
16 sure I get it right.  You made several
17 allegations related to what is called fraud.
18 Both -- there's several species of fraud in
19 Alabama.  Tell me what -- and basically it's --
20 it's Mr. Splawn told you something that wasn't
21 true.  Okay?
22    A    (Witness nods head.)
23    Q    One of the counts is that he knew it
00032
01 wasn't true when he told you that.  Tell me
02 everything that you say that Mr. Splawn told you
03 that wasn't true that he knew was not true.
04         MR. COUCH:  Object to the form.
05         MR. LAMPKIN:  What's wrong?
06         MR. COUCH:  To the extent that your
07 question calls for a legal conclusion under the
08 application of law fact, which on the premise of
09 the question, you started giving him an example
10 or talk as to the different animals or variety
11 of fraud in the state of Alabama.
12         MR. LAMPKIN:  Okay.  The complaint --
13 I'm going based on what's in the complaint.  And
14 let me find it.  Fraudulently misrepresented and
15 failed to disclose the true nature.  The
16 representation made by the defendants were false
17 and the defendants knew they were false.  So
18 that's intentional fraud.
19         MR. COUCH:  And it's also a legal
20 conclusion alleged by his attorney, me.
21         MR. LAMPKIN:  Okay.  I want to know
```

22  what it is that he contends he was told that
23  wasn't true.
00033
01          MR. COUCH:  Yeah.  And I'm not telling
02  him -- I'm not instructing this witness not to
03  answer.
04          MR. LAMPKIN:  I understand.
05          MR. COUCH:  I'm putting my objection to
06  form on the grounds that I stated on the Record.
07      A    Well, the fact about the -- telling me
08  that there was a group policy and when, you
09  know -- and then evidently it wasn't because I
10  was informed -- well, I saw on TV this thing
11  about MEGA Life.  And I called the law office,
12  and they referred me to Mr. Couch and he
13  explained to me what was going on.
14      Q    Okay.
15      A    That's, you know -- that's -- that's
16  basically how I had found out about it.
17      Q    All right.  So you saw an ad on TV?
18      A    Yes.
19      Q    Do you recall what law firm it was that
20  had the ad?
21      A    Goldberg.
22      Q    Goldberg law firm.  What station did
23  you see that on?
00034
01      A    I don't remember.
02      Q    Okay.  So you called the Goldberg law
03  firm, and then they referred you to Mr. Couch's
04  office?
05      A    Yes, sir.
06      Q    Did you ever have any meetings or
07  anything with the Goldberg law firm?
08      A    No, sir.
09      Q    What did the ad say?
10      A    To be honest, I don't remember.  It
11  just -- it caught my attention when it named
12  MEGA.  And I called just to see, you know, what
13  it was about and -- because, you know, that was
14  my insurance company.  I see this on TV and it
15  concerned me.
16      Q    Who did you talk to at the Goldberg
17  firm?
18      A    I -- man, that's been -- I -- I don't
19  know.
20      Q    How long ago was it that you talked to
21  the Goldberg firm?
22      A    I couldn't tell you exactly.  Well, I
23  don't want to tell you a lie.
00035
01      Q    Give me your best -- your best
02  recollection.
03          THE WITNESS:  Well, it was a couple of
04  months before I met with you, so when -- when
05  did we -- last...
06          MR. COUCH:  We first met in August of

```
07  last year.
08     A    Okay.  August of -- of 2005, so it was
09  a couple of months before that, you know,
10  roughly.
11     Q    Okay.  What were you told by the person
12  you spoke to at the Goldberg firm?
13         MR. COUCH:  Object to the form of the
14  question, and I'm going to instruct the witness
15  not to answer to the extent that he's asking for
16  communications between he and counsel.
17         MR. LAMPKIN:  Okay.  Let me -- so
18  you're asserting it's protected by the
19  attorney-client privilege?
20         MR. COUCH:  Oh, absolutely.
21     Q    Mr. Tillerson, you saw an ad on TV;
22  right?  Is that correct?
23     A    Yes, yes, yes.
00036
01     Q    Okay.  You saw MEGA's name mentioned,
02  so you picked up the phone and you called the
03  Goldberg firm; is that right?
04     A    Yes.
05     Q    Okay.  During this conversation, did
06  you talk to a lawyer?
07     A    I don't remember.
08     Q    Okay.  When you picked up the phone and
09  called the Goldberg firm, were -- had you
10  retained the Goldberg firm to represent you in
11  any way regarding any matter related to MEGA?
12     A    I'm not sure I understand what you're
13  asking.
14     Q    Had you -- had you hired them as your
15  lawyer?
16     A    Well, I thought they were going to take
17  care of it and -- so, yes.  And then they
18  referred me to Mr. Couch.
19     Q    And I'm not asking you what you talked
20  to Mr. Couch about.
21     A    No, no, no.  I'm just saying when I
22  called them, I was assuming they were going to,
23  you know...
00037
01     Q    Had you asked them to represent you
02  when you called them?
03     A    Well, I guess -- I guess so.  I called
04  them and, you know, asked them what I needed to
05  do, so I -- like I said, it's been a while,
06  man.  I don't remember the exact words.  But,
07  yeah, I thought they were taking care of it.  As
08  a matter of fact, I was a little surprised when
09  I heard, you know, from Mr. Couch's office.
10     Q    Had you ever signed a contract with the
11  Goldberg firm retaining them to represent you in
12  any matter related to MEGA?
13     A    To be honest, I don't remember.  Sue
14  has me sign stuff all the time.  It's possible.
15  I don't know to be honest.
```

16     Q     Did you ever go to the offices -- the
17 Goldberg offices and sit down with somebody and
18 talk to them or just --
19     A     No.
20     Q     Let me ask you.  Did you have just one
21 telephone conversation with them?
22     A     Yes.
23     Q     And this is when you called them after
00038
01 seeing the ad; is that right?
02     A     Right.  Then after that, Sue talked to
03 them.
04     Q     And you never went in and sat down with
05 a lawyer and -- and signed any sort of contract
06 with the Goldberg firm for them to represent
07 you?
08     A     Like I said, I did not go to their
09 offices, so...
10     Q     Are you aware of signing any sort of
11 contract with the Goldberg firm?
12     A     Like I said, I -- I don't know for a
13 fact, you know.  Sue may have said, here, you
14 need to sign this, and I signed it.  I don't ask
15 her questions.
16     Q     Again, my question is, do you recall
17 what you were told in this conversation with the
18 Goldberg firm --
19     A     No.
20     Q     -- about -- okay.  Let me finish --
21 about MEGA and anything about them in relation
22 to the ad and what you recall?
23     A     No.
00039
01     Q     So, as I understand it, the thing that
02 we've got that's not true is that this was a
03 group policy; is that right?
04     A     (Witness nods head.)
05     Q     Is there anything else that you say
06 that you were told by Dan Splawn back in 1996
07 that was not true?
08     A     At this time, that's -- you know, the
09 major thing was that it was a group policy based
10 on all the self-employed people in the state of
11 Alabama and that's why I could not be singled
12 out for a rate increase.
13     Q     So I guess we could add as number 2 you
14 could not be singled out as a rate increase?
15     A     Well...
16     Q     Or do you want to put --
17     A     You know, that's -- you know, that's
18 something I haven't really got into too much.
19 Right now we're -- you know, just the fact that
20 he misrepresented the fact that it was a group
21 policy.
22     Q     Another claim in the complaint is --
23 let me find it -- that the defendants concealed
00040

```
01  facts.  It's called suppression of material
02  facts.  Concealed information from you.  What is
03  it that you contend that was concealed from you
04  that you should have been told that you were
05  not?
06           MR. COUCH:  Object to the form.
07      Q    You can answer.
08           MR. COUCH:  Yeah.
09           THE WITNESS:  I thought you were --
10           MR. COUCH:  No.  I was just putting my
11  objection on the Record.
12      A    Just the fact that I was told it was a
13  group policy and evidently it wasn't, you know.
14      Q    Is there anything else that you say
15  that you -- was concealed from you that you
16  should have been told that you were not told?
17           MR. COUCH:  Same objection.
18      A    To the best of my knowledge, no.
19      Q    Okay.  I think the last count is
20  probably the same as the first, but let me make
21  sure.  The last count is basically that the
22  defendants innocently, recklessly, negligently,
23  wantonly made misrepresentations to you.  Would
00041
01  that be the same thing we just covered --
02      A    Same thing.
03      Q    -- under the group policy?
04      A    Yes.
05      Q    Anything else?  Is there anything else
06  that you assert that you were told that wasn't
07  true?
08      A    To the best of my recollection at this
09  time, I'm going to have to say no.
10      Q    Is there anything else that we've not
11  covered that you say that you were not told that
12  you should have been told about the insurance?
13      A    I would have to say to the best of my
14  knowledge that's it right now.
15      Q    Prior to purchasing the policy at issue
16  from PFL, have you attempted to purchase any
17  other health insurance?
18      A    Before getting this?  No, sir.
19      Q    Up until the time you went to work at
20  Ram Tool and were covered by or became at least
21  eligible for the BlueCross BlueShield coverage,
22  did you attempt to purchase any other health
23  insurance from any other carrier besides PFL?
00042
01      A    Yes.  I looked around, but nobody would
02  touch me because of preexisting, you know...
03      Q    Okay.  When did you look around?
04      A    Wow.  I'd have to say it was about five
05  years ago.  Something like that.
06      Q    Which insurance companies did you talk
07  to?
08      A    Just BlueCross BlueShield.
09      Q    And you were told they wouldn't cover
```

```
10  you?
11      A     Right.
12      Q     What preexisting conditions did they
13  tell you that you had that prevented you from
14  being covered by their -- by their policy?
15      A     Hyperactive thyroid and Graves'
16  disease.
17      Q     Hyperactive thyroid?
18      A     Yes, sir.
19      Q     I think in -- I saw something that
20  referenced leukemia.  Do you have leukemia?
21      A     Well, I have a form of leukemia called
22  polycythemia vera, or something like that.  But
23  the -- it's not the white blood cell type
00043
01  leukemia.  It's where your body makes too much
02  red.  Yeah, so I have that as well.
03      Q     Okay.  Did BlueCross tell you they
04  wouldn't cover you because of that?
05      A     To tell you the truth, I don't remember
06  that -- I -- I -- I -- I don't remember that.  I
07  do remember specifically, though, the Graves'
08  disease.  They didn't want anything to do with
09  it.
10      Q     When were you diagnosed with the
11  hyperactive thyroid?
12      A     I don't know exactly, but it's probably
13  close to around seven, eight years ago.
14      Q     Who's the doctor treating you for that?
15      A     Dr. Pino.
16      Q     Spell the last name, please.
17      A     P-I-N-O.
18      Q     And where is Dr. Pino?
19      A     Brookwood Medical Facility here in
20  Birmingham.
21      Q     Has he been treating you for seven or
22  eight years?
23      A     No, sir.  He's -- he's been seeing me
00044
01  the last few years.
02      Q     Who treated you before that?
03      A     Let me think what his name was.  It was
04  in Montgomery.  I can't believe I'm drawing a
05  blank.  I can't believe I can't remember his
06  name.  I want to say Dr. Trippe --
07      Q     Okay.
08      A     -- I believe was his name.
09      Q     What about the Graves' disease?  Who's
10  treating you for that?
11      A     Dr. Pino.
12      Q     Dr. Pino.  When were you diagnosed with
13  Graves' disease?
14      A     Just shortly after they found out about
15  my hyperactive thyroid.  It's all kind of
16  connected.
17      Q     Now, I've never heard of Graves'
18  disease.  I don't do a lot of medical work.
```

```
19  What is that?
20      A    Well, basically -- now, this is the
21  best of my understanding.  Graves' disease
22  makes, among other things -- it makes your eyes
23  bug out because the muscles behind your eyes
00045
01  swell to the point to where it puts so much
02  pressure on them that it can mess up your
03  sight.  You know, things like that.  So I had to
04  have an orbital decompression where they open
05  the wholes up in my skull bigger to accommodate
06  the swelling because there's not much else they
07  can do about it.
08      Q    Okay.  Who is treating you for the
09  leukemia condition?
10      A    Dr. Morrison at The Cancer Center in
11  Montgomery.
12      Q    When were you diagnosed with that?
13      A    I don't remember exactly.  It's been
14  probably in the last four years, I would say.
15      Q    Okay.
16      A    Four or five maybe.  I don't remember
17  exactly.  It seems like some -- somewhere around
18  there.  Sue's got that in all the -- all the
19  records.
20      Q    I'll tell you what.  We've been going
21  about an hour.  Why don't we take a short
22  break?
23
00046
01      (Whereupon, a brief recess was had in
02  the proceeding.)
03                  EXAMINATION
04  BY MR. LAMPKIN:
05      Q    Mr. Tillerson, can you tell me -- you did
06  file claims on your insurance policy; correct?
07      A    Yes, sir.
08      Q    Okay.  And you did have claims that
09  were paid; right?
10      A    Yes, sir.
11      Q    The payment of any of those claims is
12  not at issue in this lawsuit, is it?
13      A    No, sir.
14      Q    Okay.  I just wanted to verify that.
15          I believe you purchased -- your policy
16  went into effect -- I know it went into effect
17  in July of 1996.  When was the first time you
18  received notification that your rates would
19  increase?
20      A    I don't remember.
21      Q    I'm going to show you what we're going
22  to mark as Exhibit 3 to your deposition.
23
00047
01      (Whereupon, Defendants' Exhibit
02  Number 3 was marked for identification
03  and copy of same is attached hereto.)
```

```
04
05      Q    And it's two pages.  And those are
06 TI300037 and 39.
07           Mr. Tillerson, these are documents that
08 your attorney produced to us as being documents
09 that you had in your possession?
10      A    Okay.
11      Q    Exhibit 3 is a letter dated December
12 21, 1998; correct?
13      A    Yes, sir.
14      Q    Okay.  Back in 19 -- December of 1998
15 was your address 459 Silver Hill Road,
16 Dadeville, Alabama?
17      A    Beg your pardon?
18      Q    Is that the correct address for
19 December of 1998?
20      A    Well, that's where Sue got everything
21 sent because that's -- like I said, she took
22 care of the paperwork.  That's my father's
23 house.  I did not live there.  No.
00048
01      Q    Okay.  This is a notification that your
02 premium was going to increase to three hundred
03 and ten dollars a month; is that correct?
04      A    Yes, sir.
05      Q    You see that?
06      A    Yes, sir.
07      Q    And if you look down in the one, two,
08 three, fourth paragraph on the first page, tell
09 me if what I'm reading is correct.  Although no
10 one likes rate increases, the insurance company
11 must keep pace with the rising costs to be able
12 to pay future claims.  Everyone with coverage
13 such as yours will experience an increase.
14 Therefore, your premium will increase to three
15 hundred and ten dollars on January 26, 1999;
16 correct?
17      A    Uh-huh.  Yes, sir.
18      Q    After you received this increase, what
19 did you do -- or this notice that it was -- your
20 premium was going to increase, what did you do?
21      A    I -- what do you mean what did I do?  I
22 paid it.
23      Q    Did you call anybody?
00049
01      A    Not that I remember.
02      Q    Did you have any discussions with
03 anybody at PFL Life Insurance Company?
04      A    Not at that time, no.
05      Q    If you look down in the next paragraph,
06 the fifth paragraph, the second sentence says to
07 limit the amount of increase or possibly even
08 lower your premium, you may want to consider
09 changing your benefit level.
10           Did you do anything to change your
11 benefit level at that time?
12      A    No, sir, not that I recall.
```

```
13      Q    Are you aware that -- of any evidence
14 that would contradict the statement in this
15 letter that everyone with coverage such as yours
16 will experience an increase?
17           MR. COUCH:  Object to the form.  Go
18 ahead.
19           THE WITNESS:  Do I --
20           MR. COUCH:  No.  I put an objection on
21 the Record.
22      A    Could you repeat the question?
23      Q    Are you aware of any evidence that
00050
01 would contradict the statement contained in this
02 letter that everyone with coverage such as yours
03 will experience an increase?
04           MR. COUCH:  Same objection.
05      A    At that time, no.  But since all this
06 is going on, you know, I believe that to
07 be the case.
08
09      (Whereupon, Defendants' Exhibit
10 Number 4 was marked for identification
11 and copy of same is attached hereto.)
12
13      Q    I'm going to get to there -- that in
14 just a little bit.
15           I'll show what I'm going to mark
16 Exhibit 4 to your deposition, which is Bates
17 labeled TI300041 and 42, and this is a June 21,
18 1999 letter to you from PFL Life Insurance
19 Company?
20      A    (Witness reviews document.)
21      Q    Do you recall seeing this letter
22 before?
23      A    Well, I don't remember it, but I -- you
00051
01 know, I'm not saying I didn't get it or
02 anything.
03      Q    Whose writing is that on that letter?
04 There's some handwritten notations.
05      A    I would say possibly Sue's writing, Sue
06 Tinkey.
07      Q    Okay.  So you believe that would be Sue
08 Tinkey's writing?
09      A    Now, I can't say for sure, but I would
10 say that's probably it because, like I said, she
11 handled all the paperwork.
12      Q    Does that look like your writing
13 anywhere on there?
14      A    No.  That's -- no.  That's not my
15 writing.  I know that for a fact.
16      Q    And on June 21, 1999, you were advised
17 that your premiums were going to increase to
18 three hundred and seventy-five dollars; correct?
19      A    Yes, sir, that's what that says.
20      Q    And, again, in the fourth paragraph,
21 the second sentence, everyone with coverage such
```

```
22  as yours will experience an increase.
23  Therefore, your premium will increase to three
00052
01  seventy-five on July 26, 1999; correct?
02      A   Yes.
03      Q   And we come down to the fifth paragraph
04  and it says, to limit the amount of increase or
05  possibly even lower your premium amount, you may
06  want to consider changing your benefit level;
07  correct?
08      A   Yes.
09      Q   And you've had that document in your
10  possession, as well as Exhibit 3, since they
11  were sent in 1998 and 1999; right?
12      A   Yes.
13      Q   I understand you may have -- Sue may be
14  handling your paperwork, but --
15      A   Right.  Right.
16      Q   -- she was the person --
17      A   Who provided the documents, so she had
18  them.
19      Q   Okay.  And I'm going to show you what
20  I'm going to mark as Exhibit 5 to your
21  deposition.  We'll make this -- it's two pages.
22  It's TI300044 and 45.  I think I put this
23  exhibit on the wrong piece of paper.
00053
01
02      (Whereupon, Defendants' Exhibit
03  Number 5 was marked for identification
04  and copy of same is attached hereto.)
05
06      Q   This is a June 28, 1999 letter to you;
07  correct?
08      A   Yes, sir, it's addressed to me.
09      Q   Okay.  And it says as -- first
10  paragraph says, as requested, we've changed your
11  preferred provider organization plan to Plan D,
12  effective July 26, 1999; correct?
13      A   Yes.
14      Q   The enclosed documents reflect the
15  change.  Please keep them with your certificate
16  for future reference.  Then it says, due to this
17  change, your total monthly premium is now two
18  hundred and sixty-nine dollars; correct?
19      A   Yes.
20      Q   And the enclosed document appears to be
21  an endorsement that says, preferred provider
22  organization plan option has been changed to
23  Plan D.  All other benefits have been changed
00054
01  accordingly.  The schedule of benefits
02  reflecting the change is effective July 26,
03  1999; correct?
04      A   Correct.
05      Q   And you've had that document in your
06  possession since sometime in 1999?
```

```
07     A    Yes, sir.
08     Q    I'll show you what I'm going to mark as
09  Exhibit 6 to your deposition, which consists of
10  TI300051 and 52.
11
12     (Whereupon, Defendants' Exhibit
13  Number 6 was marked for identification
14  and copy of same is attached hereto.)
15
16     A    (Witness reviews document.)
17     Q    This is a letter dated December 20,
18  1999 to you?
19     A    Yes, sir.
20     Q    Okay.  And this reflects that your
21  premium is going to increase to three hundred
22  and thirty-one dollars; correct?
23     A    Yes.
00055
01     Q    And, again, if we come down to the
02  fourth paragraph it says, everyone with coverage
03  such as yours will experience an increase.
04  Therefore, your premium will increase to three
05  hundred and thirty-one dollars on January 6,
06  2000?
07     A    Correct.
08     Q    And, again, the fifth paragraph, to
09  limit the amount of the increase or possibly
10  even lower your premium amount, you may want to
11  consider changing your benefit level; correct?
12     A    Correct.
13     Q    And you've had that document in your
14  possession since late 1999; correct?
15     A    Yes.
16     Q    I'll show you what I'm going to mark as
17  Exhibit 7 to your deposition, which consists of
18  TI300053.  And, apparently, we didn't get the
19  second page on this one.  But the first page is
20  what I need.
21
22     (Whereupon, Defendants' Exhibit
23  Number 7 was marked for identification
00056
01  and copy of same is attached hereto.)
02          MR. COUCH:  And by the way, James, are
03  those Bates stamp numbers from my office or your
04  office?
05          MR. LAMPKIN:  They're from my office.
06          MR. COUCH:  Okay, good.  Because the
07  thing I handed you this morning in supplement
08  didn't have a stamp like that.
09          MR. LAMPKIN:  The three tells me
10  they're from -- who they're from, the three at
11  the first.  Because ours -- the ones we produced
12  had a zero, so that tells me they're from you.
13          MR. COUCH:  Okay.  Got you.
14     Q    Mr. Tillerson, this is a -- and I'll
15  tell you what.  Let's just attach TI300056 and
```

```
16  57, which is the same letter.  We'll just make
17  that part of Exhibit 3 since it does have both
18  pages.  This is a letter dated June 19, 2000;
19  correct?
20      A    Yes.
21      Q    And it's to you; right?
22      A    Yes.
23      Q    This is advising you that your premium
00057
01  is going up to three hundred and fifty-three
02  dollars; correct?
03      A    Yes.
04
05      (Whereupon, a brief interruption was
06  had in the proceeding.)
07
08      Q    If you come down, you see a little
09  table there.  It's got current rate and new
10  rate; correct?
11      A    Correct.
12      Q    Then it -- in the sentence below that
13  it says, your new billing amount will be
14  increasing to three hundred fifty-three dollars
15  on July 26, 2000; right?
16      A    Yes.
17      Q    Is that 7?
18          MR. COUCH:  He was asking if that's
19  Number 7.
20      A    Oh, yes, yes, yes.
21      Q    And you've had that document in your
22  possession since sometime in 2000?
23      A    Yes, sir.
00058
01      Q    I'll show you what I'm going to mark as
02  the next exhibit.  This will be Exhibit 8 to
03  your deposition.  It is two pages Bates labeled
04  TI300059 and 60.
05
06      (Whereupon, Defendants' Exhibit
07  Number 8 was marked for identification
08  and copy of same is attached hereto.)
09
10      Q    Is that a letter dated to you December
11  26, 2000, Mr. Tillerson?
12      A    Yes.
13      Q    And that document letter is advising
14  you that your premiums are going to go up to
15  three hundred and sixty-seven dollars a month;
16  correct?
17      A    Yes.
18      Q    And, again, if we come down to the
19  fourth paragraph it says, everyone with coverage
20  such as yours will experience an increase.
21  Therefore, your premiums will increase to three
22  hundred and sixty-seven dollars on June 26,
23  2000?
00059
```

```
01      A     Yes.
02      Q     2001.  I'm sorry.  Correct?
03      A     Correct.
04      Q     And you've had that document in your
05 possession since late December 2000?
06      A     Yes.
07      Q     I'll show you the next exhibit, which
08 is TI300062, and we're going to mark it as
09 Exhibit 9.
10
11      (Whereupon, Defendants' Exhibit
12 Number 9 was marked for identification
13 and copy of same is attached hereto.)
14
15      Q     Is that a letter to you dated June 25,
16 2001?
17      A     Yes.
18      Q     And that letter is advising you your
19 premiums are going to increase to three hundred
20 and seventy-eight dollars a month?
21      A     Yes, sir.
22      Q     And, again, the fourth paragraph of the
23 letter says, everyone with coverage such as
00060
01 yours will experience an increase.  Therefore,
02 your premium will increase to three hundred and
03 seventy-eight dollars on July 26, 2001; correct?
04      A     Yes.
05      MR. LAMPKIN:  Again, let's just go on
06 and make TI300065 and 66 part of Exhibit 9.
07 It's the same letter.  I just didn't have the
08 back page with that first one.  Will you check
09 it and see?
10      MR. COUCH:  I trust you.
11      Q     Mr. Tillerson, I'm going to show you
12 the next exhibit, which is -- on the wrong page
13 again.  It's going to be Exhibit 10 to your
14 deposition, which consists of documents Bates
15 labeled 30069 (sic) through 70.
16
17      (Whereupon, Defendants' Exhibit
18 Number 10 was marked for identification
19 and copy of same is attached hereto.)
20
21      A     (Witness reviews document.)
22      Q     Is that a letter to you dated December
23 24, 2001?
00061
01      A     Yes, sir.
02      Q     And that letter is advising you your
03 premiums are going to increase to four hundred
04 and nine dollars; correct?
05      A     Correct.
06      Q     And, again, the fourth paragraph says,
07 everyone with coverage such as yours will
08 experience an increase.  Therefore, your premium
09 will increase to four hundred and nine dollars
```

```
10  on January 26, 2002?
11      A    Correct.
12      Q    And you've had that document in your
13  possession since late 2001 or early 2002?
14      A    Yes, sir.
15
16      (Whereupon, Defendants' Exhibit
17  Number 11 was marked for identification
18  and copy of same is attached hereto.)
19
20      Q    Let me show you Exhibit 11 to your
21  deposition, which are documents Bates labeled
22  TI300073 through 74.  No.  Just 73.  I'm sorry.
23  I don't have the other page.
00062
01      A    (Witness reviews document.)
02      Q    Is that a letter dated to you -- to you
03  dated June 24, 2002?
04      A    Yes, sir.
05      Q    And that's advising you the premium is
06  going to increase to four hundred and
07  fifty-eight dollars; is that correct?
08      A    Yes, sir.
09      Q    You see where it says -- the
10  handwriting on that above the exhibit label?  Do
11  you know whose handwriting that is?
12      A    I would have to assume it was Sue's.  I
13  do not know.  It's not mine.
14      Q    And it says fee schedule; right?
15      A    I believe so.
16      Q    That's what it appears to be to me.
17      A    Right.
18      Q    Okay.  If we come down to the fourth
19  paragraph again -- the fourth paragraph of
20  Exhibit 11 it says, everyone with coverage such
21  as yours will experience an increase.
22  Therefore, your premium will increase to four
23  hundred and fifty-eight dollars on July 26,
00063
01  2002; correct?
02      A    Correct.
03
04      (Whereupon, Defendants' Exhibit
05  Number 12 was marked for identification
06  and copy of same is attached hereto.)
07
08      Q    Okay.  I'll show you what I'm going to
09  mark as Exhibit 12 to your deposition, which
10  consists of the pages right in front me,
11  TI300078 through 79.
12      A    (Witness reviews document.)
13      Q    Is that a letter to you dated December
14  26, 2002?
15      A    Yes, sir.
16      Q    And that letter is advising you that
17  your premiums will increase to four hundred and
18  eighty dollars; is that correct?
```

```
19      A    Yes, sir.
20      Q    And, again, the fourth paragraph says,
21  everyone with coverage such as yours will
22  experience an increase.  Therefore, your premium
23  will increase to four hundred and eighty dollars
00064
01  on January 26, 2003; correct?
02      A    Correct.
03      Q    Last one.  I'll show you two documents
04  Bates labeled TI300087 through 88.
05
06      (Whereupon, Defendants' Exhibit
07  Number 13 was marked for identification
08  and copy of same is attached hereto.)
09
10      Q    Is that a letter to you dated June 26,
11  2003?
12      A    Yes, sir.
13      Q    And this one is advising you that your
14  premiums will increase to five hundred and
15  thirty-one dollars; correct?
16      A    Yes, sir.
17      Q    Again, the fourth paragraph says,
18  everyone with coverage such as yours will
19  experience an increase.  Therefore, your billing
20  amount will increase to five hundred and
21  thirty-one dollars on June 26, 2003 ;correct?
22      A    Yes.
23      Q    Mr. Tillerson, you've -- according to
00065
01  these records, it appears that you had your
02  first rate increase on -- in December of 1998.
03  Does that sound correct?
04      A    Yes, sir.
05      Q    Do you recall a rate increase before
06  then?
07      A    No, I don't recall it.
08      Q    Okay.  And since then, your premiums --
09  other than when you changed to Plan D in July of
10  1999, your premiums have increased; correct?
11      A    Correct.
12      Q    And that's -- they've gone from three
13  hundred and ten dollars a month, dropped down to
14  two hundred and sixty-nine dollars a month in
15  July 1999 when you changed plans; correct?
16      A    Correct.
17      Q    And then they started going up.  And
18  through July 26 of 2003, they have increased
19  from two hundred and sixty-nine dollars a month
20  to five hundred and thirty-one dollars a month;
21  correct?
22      A    Correct.
23      Q    And you were aware of those premium
00066
01  increases; correct?
02      A    Correct.
03      Q    And you had been paying those premium
```

```
04  increases that whole time; correct?
05      A    Yes.  True.
06      Q    What evidence do you have that you were
07  singled out for any of those increases?
08           MR. COUCH:  Object to the form.
09      A    Like I said, I didn't know anything
10  about it until I talked to Mr. Couch here about
11  what was going on.  I mean, the letter said that
12  everybody was getting an increase, so I thought
13  that's what was going on.
14      Q    What evidence do you have that would
15  show that everyone wasn't getting an increase?
16           MR. COUCH:  Same objection.
17      A    Like I said, I -- my lawyer, Mr. Couch,
18  he's -- he informed me of everything and that
19  would be something you'd have to get from him, I
20  guess.
21      Q    You started -- I think we went over
22  with your hyperthyroid.  That was seven or eight
23  years ago, correct, that you were diagnosed?
00067
01      A    Well, I would have to get my medical
02  records to be exactly sure, but some --
03  somewhere along -- somewhere along those lines,
04  I would say.
05      Q    Well, was it --
06      A    You may -- I don't know.  You may have
07  them.  Sue may have already turned those over.
08      Q    Was it before October of 2003 when you
09  were diagnosed with hyperthyroid?
10      A    To be honest, I don't remember.  I
11  mean, I've had it awhile.
12      Q    What evidence do you have that you were
13  singled out for rate increases due to your
14  medical conditions?
15           MR. COUCH:  Object to the form.
16      A    Like I said, you would have to talk to
17  Mr. Couch about that.
18      Q    Well, understand, I can't put Mr. Couch
19  under oath and he's not a witness in this case.
20  I'm trying to find out -- let me just ask it
21  this way.  Are you aware of any facts that would
22  prove that you were singled out for a rate
23  increase?
00068
01           MR. COUCH:  Other than what he got from
02  his conversation with me, I'm assuming?
03      A    Well, that would be my answer, only
04  what I've been told by Mr. Couch.  I -- you
05  know, I -- other than that, no, I don't --
06      Q    Is he going to get on -- is he going to
07  get on the stand and testify?  Who's going to
08  testify as to the --
09           MR. COUCH:  Let's go off the Record a
10  minute.
11
12       (Whereupon, a discussion was held off
```

13  the Record.)
14
15      Q    Mr. Tillerson, I understand what you
16  said is what you learned from your attorney.
17  Outside of what you learned from your attorney,
18  are you aware of any facts that would tend to
19  prove that you were singled out for a rate
20  increase?
21      A    Outside of that, no.
22      Q    Okay.  Are you aware of any facts that
23  would tend to prove that you received a rate
00069
01  increase due to your medical conditions?
02      A    Could you explain that a little
03  better?
04      Q    Sure.  Are you aware any facts that you
05  would say would prove that you received a rate
06  increase due to your claim history and your
07  medical condition?
08      A    I'm not aware of any facts to that
09  other than what I was explained by Mr. Couch,
10  so, no.
11      Q    Okay.  You are aware that since 1998,
12  other than whenever you dropped your change in
13  coverage down to a Plan D -- or to Plan D, that
14  your premium increases have gone up every six
15  months?
16      A    Yes.
17      Q    Your premiums have gone up every six
18  months?
19      A    Correct.
20      Q    And you've known that -- you knew that
21  each time you got a premium increase; right?
22      A    Yes.
23      Q    Tell me how you suffered any damage as
00070
01  a result of purchasing this policy from -- the
02  PFL policy.
03          MR. COUCH:  Object to the form.
04      A    Damages.  I really couldn't say damages
05  other than the fact that, you know, I just knew
06  I had to have coverage, so I paid the premiums,
07  you know.  And, like I said, I had checked
08  around some other places but nobody would take
09  me, so -- you know, I had to have insurance, so
10  I kept it up.  And I was just -- I just kept
11  wondering, you know, how much is it going to go
12  up.  Am I going to end up being able to pay for
13  this one day when I need it, you know.
14      Q    And you've been paying your premiums,
15  and when you filed claims, your claims have been
16  paid in accordance with the terms and conditions
17  of your policy; correct?
18      A    As far as I know.
19      Q    And you don't have any complaints about
20  what's been paid on your claims, do you?
21      A    As far as I know.  You know, it's --

```
22  no.
23      Q     Okay.  Well, I mean, you were the one
00071
01  that would have to deal with that; right?  You
02  were the one that would get bills from your
03  either your medical providers or the hospital or
04  --
05      A     Right.  Right.  Right.
06      Q     And so you would know --
07      A     Right.  I'd have to -- I'd have to pay
08  the difference, you know, and I paid it.
09      Q     And all this time since 1996 until, I
10  guess, sometime last year, you've been paying
11  your premiums, and when you submitted claims,
12  the claims have been paid to your satisfaction;
13  is that correct?
14      A     I would have to say yeah.
15      Q     Okay.  And it wasn't until you saw this
16  ad on the TV that -- that -- I understand the
17  premium increases were something you were
18  concerned about?
19      A     Right.  I mean, they concerned me, but,
20  you know, like I said, I -- like the letter
21  said, it was for everybody across the board, and
22  then, you know, I saw the ad and I was like, you
23  know, what's going on here.
00072
01      Q     Okay.  And you're not aware of any
02  facts that would prove that it wasn't for
03  everyone across the board?
04      A     Other than what me and Mr. Couch have
05  talked about, no.
06      Q     Okay.  One of the things that -- that
07  makes up the elements of your claim is -- is
08  damage.  And that's what I'm trying to find out
09  is how you were damaged as a result of
10  purchasing this policy.
11      A     Well --
12          MR. COUCH:  Object to the form.
13      A     You know, like I said, the way I was
14  looking at it, you know, I wondered when, you
15  know, this price increase would, you know, level
16  out, stop, whatever you want to say, because I'm
17  looking at the future and thinking, you know,
18  what happens one day down the road when I can't
19  afford these premiums anymore and I have one of
20  these deals where I have to go in and have
21  something major medical done.  I'm going to lose
22  everything.  You know, my house, everything.
23  And so I'd say that that was -- you know,
00073
01  weighed pretty heavy, but...
02      Q     But that's something that's been taken
03  care of now that you're at Ram Tool and you have
04  BlueCross; correct?
05      A     Since I -- since I have been on there.
06  Of course, I haven't made a claim with BlueCross
```

07  because of the time period I'm having to wait.
08  That's why I'm still having to keep up the
09  insurance with MEGA.
10      Q    And they're still paying your claims as
11  submitted?
12      A    As far as I know.
13      Q    Okay.  Have you sought any type of
14  treatment for any worry or anxiety or anything
15  like that that you may have suffered as a result
16  of finding out that the policy was allegedly not
17  what you were told?
18      A    No.
19      Q    Okay.  You've not gone to a
20  psychologist or psychiatrist?
21      A    No.
22      Q    Or not sought any type of counseling?
23      A    No.
00074
01      Q    Not on any kind of medication for any
02  worry or anxiety or anything like that?
03      A    No.
04      Q    Your concern was the premiums
05  continuing to increase and being afraid that one
06  day you might not be able to afford it; is that
07  right?
08      A    I'm just saying, yeah, that -- that was
09  a major concern for me.  That definitely would
10  be for anybody.
11      Q    Did you seek any sort of professional
12  help to -- for that concern?
13      A    No.
14      Q    Did you talk to any sort of pastor or
15  anything about that about such concerns?
16      A    No.
17      Q    Did you talk to anyone about those
18  concerns?
19      A    You know, family members.  Things like
20  that.
21      Q    Who did you talk to?
22      A    Sue, my father, you know.
23      Q    Anybody else?
00075
01      A    Well, not really because, you know,
02  they're so related to the work I was doing and
03  with my insurance, you know.  Just, you know,
04  talked to them about it.  And that's about it as
05  far as my recollection is.  No, I didn't talk to
06  anybody about it.
07      Q    Well, when did you first talk to Sue
08  about being concerned about the premium
09  increases and not being able to afford it?
10      A    I don't remember exactly when it was.
11  It was after they'd gone above five hundred
12  dollars.
13      Q    Well, they first went above five
14  hundred dollars in -- on June 26, 2003?
15      A    Okay.  If you say -- if you say so.  I

```
16  just remember, you know, thinking my God, you
17  know.
18       Q    Would you have talked to Sue after you
19  got that premium increase about being concerned
20  about it?
21       A    Well, like I said, I didn't go into
22  nothing heavy, but I made mention of it, you
23  know.  I don't remember exactly when it was or
00076
01  what was said.
02       Q    Okay.
03       A    I just remember talking to her about
04  it.
05       Q    I mean, once you got that letter, that
06  would be something fresh on your mind.  Would it
07  be logical that you would probably talk to her
08  around the time you received that letter?
09       A    Well, yeah.  But I mean, it -- I don't
10  see Sue every day or sometimes every week, so,
11  you know, I can't say exactly when it was but it
12  was around there.
13       Q    Okay.  What did you tell Sue?
14       A    Just what I explained to you.  You
15  know, the fact that -- wondered -- it seemed
16  like every six months I was getting an increase
17  and just wondering how long it was going to go
18  on and I hoped work stayed good so I could pay
19  it.
20       Q    Anything else?
21       A    As far as I remember, that was it.
22       Q    What did Sue say?
23       A    I don't remember what she said, you
00077
01  know.  You know how people are.  They agree and
02  that's about it.
03       Q    Okay.  What did you talk to your father
04  about?  What did --
05       A    Same thing basically.  I mean, I can't
06  remember exact, you know, words verbatim, but
07  basically the same thing.
08       Q    Do you recall what you father said?
09       A    No, sir.
10       Q    Did this conversation with Sue and your
11  father -- did it occur at the same time or were
12  these separate conversations?
13       A    Separate.
14       Q    Okay.  Have you talked to anybody else
15  about this other than talking to somebody at the
16  Gardberg (sic) firm and talking to Mr. Couch?
17       A    Not to my recollection, no, sir.
18       Q    Did you ever talk to anybody at PFL
19  about it?
20       A    Personally I did not.  Now, I can't
21  answer for Sue.  I don't know if she did or not.
22       Q    Has Sue -- did Sue ever tell you she
23  talked to somebody at PFL about it?
00078
```

```
01      A    Not that I can remember.  I know she
02 has called them in the past about other things,
03 but that I -- I can't say for sure.
04      Q    Okay.  Did you ever have any
05 conversations with anybody at MEGA about the
06 premium increases that you were receiving?
07      A    No, sir.
08      Q    Do you know if Sue ever had any
09 conversations with anybody at MEGA?
10      A    Not that I know of.
11      Q    Did you ever have any conversations
12 with Transamerica Life concerning the premium
13 increases?
14      A    No.
15      Q    Do you know if Sue ever had any
16 conversations?
17      A    No, sir.  I can't answer that.
18      Q    Do you know if anybody -- let me ask
19 you this.  Did you ever have any conversations
20 with anyone at National Association for the
21 Self-Employed about your insurance coverage and
22 the premium increases?
23      A    No, sir.
00079
01      Q    Do you know if Sue ever had any
02 conversations with anybody at NASE?
03      A    I can't say for Sue.  Not that I know
04 of.
05      Q    Do you know if anybody acting on your
06 behalf had any conversations with any of the
07 insurance carriers or NASE about your coverage
08 and the premium increases that you were
09 receiving?
10      A    Once again, I -- as far as I know, no,
11 because I can't answer for Sue.
12      MR. LAMPKIN:  Okay.  Give me a minute.
13 We may be done.
14      MR. COUCH:  Okay.
15
16      (Whereupon, a brief recess was had in
17 the proceeding.)
18
19      Q    Mr. Tillerson, have you told me
20 everything that you are aware of in relation to
21 what you say my clients -- the insurance
22 companies and NASE -- did that you say was
23 wrong?
00080
01      A    I'm sorry.  Hit me with that again.
02      Q    That was a bad question.  Is there
03 anything else that we've not discussed that you
04 say the insurance companies did that caused you
05 any sort of damage?
06      MR. COUCH:  Object to the form.
07      A    To the best of my recollection, no, not
08 at this time.  I -- you know, we've gone over
09 quite a bit, so...
```

```
10     Q    I understand.  We've been -- we've been
11 going at it about two hours.
12          But to the best of your knowledge,
13 you've told me everything?
14     A    To the best of my knowledge, yes.
15     Q    Okay.  And you've told me about all the
16 conversations that you've had with -- with
17 anybody associated with the insurance; correct?
18     A    Yes, sir.
19     Q    And I understand Sue may have had
20 conversations, and I need to talk to her about
21 those; correct?
22     A    Correct.
23          MR. LAMPKIN:  I think that's it.  I
00081
01 think we're done.
02
03
04
05
06
07
08
09
10
11
12
13
14
15
16
17
18
19
20
21
22
23          FURTHER DEPONENT SAITH NOT
00082
01               C E R T I F I C A T E
02
03 STATE OF ALABAMA      )
04
05 COUNTY OF MONTGOMERY )
06
07
08          I hereby certify that the above and
09 foregoing deposition was taken down by me in
10 stenotype, and the questions and answers thereto
11 were transcribed by means of computer-aided
12 transcription, and that the foregoing represents
13 a true and accurate transcript of the testimony
14 given by said witness upon said hearing.
15          I further certify that I am neither of
16 counsel, nor kin to the parties to the action,
17 nor am I in anywise interested in the result of
18 said cause.
```

```
19
20
21                    ----------------------------
21          STACEY L. JOHNSON, Certified
22          Shorthand Reporter and
22          Commissioner for the State of
23          Alabama at Large.
23
```