**TROY E. TILLERSON**

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE MIDDLE DISTRICT OF ALABAMA

3    EASTERN DIVISION

4  CASE NO. 3:05-cv-985-MEF

COPY

5

6  TROY E. TILLERSON,

7      Plaintiff,

8      V.

9  THE MEGA LIFE AND HEALTH INSURANCE CORPORATION,

10  a corporation; TRANSAMERICA LIFE INSURANCE

11  COMPANY, F/K/A PFL LIFE INSURANCE COMPANY, a

12  corporation; NATIONAL ASSOCIATION FOR THE SELF

13  EMPLOYED A/K/A NASE, a corporation,

14      Defendants.

15

16    S T I P U L A T I O N S

17    IT IS STIPULATED AND AGREED by and between

18  the parties, through their respective counsel,

19  that the deposition of TROY E. TILLERSON may be

20  taken before STACEY L. JOHNSON, Commissioner, at

21  the Offices of Hollis & Wright, P.C., 505 North

22  20th Street, Suite 1750, Birmingham, Alabama, on

23  the 24th day of April, 2006.

**Exhibit C**

**TROY E. TILLERSON**

1     Q    Okay.  Where from?

2     A    Jeff Davis.

3     Q    What year?

4     A    '81.

5     Q    Did you attend college?

6     A    No, sir.

7     Q    Since graduating high school, have you

8  had any other formal type of education, whether

9  trade school, vocational?

10    A    Well, computer training at Coastal in

11  Montgomery.

12    Q    What was the name of the place?

13  Coastal?

14    A    Coastal.  And then --

15    Q    When did you take the computer

16  training?

17    A    Let's see.  '83, '84.  Something like

18  that.  Man, that's been so long ago.

19    Q    Any other formalized schooling other

20  than Coastal?

21    A    No, sir.

22    Q    Can you read and write?

23    A    Yes, sir.

**TROY E. TILLERSON**

1   that -- that type of stuff would be, you know,

2   took care of and -- you know, like I said, I --

3   I'm just talking off what I can remember from

4   that long ago, so...

5       Q    Yes, sir.

6       A    You know.

7

8       (Whereupon, Defendants' Exhibit

9   Number 1 was marked for identification

10  and copy of same is attached hereto.)

11

12      Q    I'm going to show you what I'm marking

13  as Exhibit 1.  It consists of two pages.  It

14  would be Exhibit 1 to your deposition.  And this

15  would be a Certificate Schedule.

16      A    (Witness reviews document.)

17      Q    Did you -- after you purchased the

18  policy, did you receive the policy itself?  Did

19  you get a copy of your policy in the mail?

20      A    It was sent to my father's house, and

21  Sue gave it to me, yes.

22      Q    Okay.  So you -- at some point in 1996,

23  you will agree that you received the policy?

**TROY E. TILLERSON**

1    A    Yes, sir.

2    Q    So you've had that policy in your

3    possession to this date; is that right?  Unless

4    you gave it to your attorney?

5    A    Well, I -- I gave it back to Sue.  I

6    don't know if she gave it to Mr. Couch or not.

7    Q    Okay.  Do you remember when you -- do

8    you know when you gave the policy to Sue?

9    A    It was shortly after she gave it to

10   me.  I, you know, just looked through it.  I

11   mean, what little I could understand from, you

12   know, all that insurance jargon, you know.  I

13   basically just saw that I had it and let her

14   have it back.  She keeps, like I said, most all

15   the records.

16   Q    When you looked through the policy in

17   1996 after you received it, did you have any

18   question or concern about the policy you

19   purchased?

20   A    At that time, no.

21   Q    If you look at it in what I've marked

22   as Exhibit 1, it's got a schedule of benefits

23   payable.  Then it's got both in network and out

**TROY E. TILLERSON**

1    of network.  You come down, and you've got

2    out-of-pocket maximums.  Then you've got

3    coinsurance and things like that that are

4    listed.

5            Did you review that whenever you looked

6    at the policy?

7        A    To be honest, I don't remember.

8        Q    That's fair.  I'm going to show you

9    what we're going to mark as Exhibit 2 to your

10    deposition.  And this is a part of the policy.

11

12        (Whereupon, Defendants' Exhibit

13    Number 2 was marked for identification

14    and copy of same is attached hereto.)

15

16            MR. COUCH:  So we're clear, Exhibit 1

17    are pages 8 and 9 that are the bottom of the

18    page, right-hand corner?

19            MR. LAMPKIN:  Yeah.  I -- let me

20    identify.  Exhibit 1 consists of Bates labels

21    TI300011 and 12.  Exhibit 2 is TI3000 -- that's

22    three zeros -- 23, just for the Record.

23        Q    And -- and I'll -- Mr. Tillerson, I'll

**TROY E. TILLERSON**

1  represent this is actually a part of the policy

2  that would have been provided to you.  You see

3  down at the bottom it says Premium Changes?

4     A    Uh-huh.

5     Q    Tell me if what I read is correct.  We

6  reserve the right to change the table of

7  premiums on a class basis becoming due under the

8  group policy at any time and from time to time

9  provided we have given the group policyholder

10  written notice of at least 31 days prior to the

11  effective date of the new rates.  Is that what

12  that says?

13     A    Uh-huh.  Yes, sir.

14     Q    Can you understand that's saying the

15  company reserves the right to the change

16  premium?

17     A    Yes.

18     Q    And if you would have read that back in

19  1996, you would have known that the company had

20  the right to change the premiums; right?

21     A    Yes.

22     Q    You said that Mr. Splawn said you

23  couldn't be singled out for a rate increase.

**TROY E. TILLERSON**

1      (Whereupon, a brief recess was had in

2   the proceeding.)

3                          EXAMINATION

4   BY MR. LAMPKIN:

5   Q    Mr. Tillerson, can you tell me -- you did

6   file claims on your insurance policy; correct?

7      A    Yes, sir.

8      Q    Okay.  And you did have claims that

9   were paid; right?

10     A    Yes, sir.

11     Q    The payment of any of those claims is

12  not at issue in this lawsuit, is it?

13     A    No, sir.

14     Q    Okay.  I just wanted to verify that.

15          I believe you purchased -- your policy

16  went into effect -- I know it went into effect

17  in July of 1996.  When was the first time you

18  received notification that your rates would

19  increase?

20     A    I don't remember.

21     Q    I'm going to show you what we're going

22  to mark as Exhibit 3 to your deposition.

23

**TROY E. TILLERSON**

1          (Whereupon, Defendants' Exhibit

2    Number 3 was marked for identification

3    and copy of same is attached hereto.)

4

5          Q    And it's two pages.  And those are

6    TI300037 and 39.

7               Mr. Tillerson, these are documents that

8    your attorney produced to us as being documents

9    that you had in your possession?

10         A    Okay.

11         Q    Exhibit 3 is a letter dated December

12   21, 1998; correct?

13         A    Yes, sir.

14         Q    Okay.  Back in 19 -- December of 1998

15   was your address 459 Silver Hill Road,

16   Dadeville, Alabama?

17         A    Beg your pardon?

18         Q    Is that the correct address for

19   December of 1998?

20         A    Well, that's where Sue got everything

21   sent because that's -- like I said, she took

22   care of the paperwork.  That's my father's

23   house.  I did not live there.  No.

**TROY E. TILLERSON**

1    Q    Okay.  This is a notification that your
2    premium was going to increase to three hundred
3    and ten dollars a month; is that correct?
4    A    Yes, sir.
5    Q    You see that?
6    A    Yes, sir.
7    Q    And if you look down in the one, two,
8    three, fourth paragraph on the first page, tell
9    me if what I'm reading is correct.  Although no
10   one likes rate increases, the insurance company
11   must keep pace with the rising costs to be able
12   to pay future claims.  Everyone with coverage
13   such as yours will experience an increase.
14   Therefore, your premium will increase to three
15   hundred and ten dollars on January 26, 1999;
16   correct?
17   A    Uh-huh.  Yes, sir.
18   Q    After you received this increase, what
19   did you do -- or this notice that it was -- your
20   premium was going to increase, what did you do?
21   A    I -- what do you mean what did I do?  I
22   paid it.
23   Q    Did you call anybody?

**TROY E. TILLERSON**

1    A    Not that I remember.

2    Q    Did you have any discussions with

3    anybody at PFL Life Insurance Company?

4    A    Not at that time, no.

5    Q    If you look down in the next paragraph,

6    the fifth paragraph, the second sentence says to

7    limit the amount of increase or possibly even

8    lower your premium, you may want to consider

9    changing your benefit level.

10    Did you do anything to change your

11    benefit level at that time?

12    A    No, sir, not that I recall.

13    Q    Are you aware that -- of any evidence

14    that would contradict the statement in this

15    letter that everyone with coverage such as yours

16    will experience an increase?

17    MR. COUCH:  Object to the form.  Go

18    ahead.

19    THE WITNESS:  Do I --

20    MR. COUCH:  No.  I put an objection on

21    the Record.

22    A    Could you repeat the question?

23    Q    Are you aware of any evidence that

**TROY E. TILLERSON**

1    would contradict the statement contained in this

2    letter that everyone with coverage such as yours

3    will experience an increase?

4          MR. COUCH:  Same objection.

5      A   At that time, no.  But since all this

6    is going on, you know, I believe that to

7    be the case.

8

9        (Whereupon, Defendants' Exhibit

10   Number 4 was marked for identification

11   and copy of same is attached hereto.)

12

13     Q   I'm going to get to there -- that in

14   just a little bit.

15        I'll show what I'm going to mark

16   Exhibit 4 to your deposition, which is Bates

17   labeled TI300041 and 42, and this is a June 21,

18   1999 letter to you from PFL Life Insurance

19   Company?

20     A   (Witness reviews document.)

21     Q   Do you recall seeing this letter

22   before?

23     A   Well, I don't remember it, but I -- you

**TROY E. TILLERSON**

1  know, I'm not saying I didn't get it or

2  anything.

3      Q    Whose writing is that on that letter?

4  There's some handwritten notations.

5      A    I would say possibly Sue's writing, Sue

6  Tinkey.

7      Q    Okay.  So you believe that would be Sue

8  Tinkey's writing?

9      A    Now, I can't say for sure, but I would

10  say that's probably it because, like I said, she

11  handled all the paperwork.

12      Q    Does that look like your writing

13  anywhere on there?

14      A    No.  That's -- no.  That's not my

15  writing.  I know that for a fact.

16      Q    And on June 21, 1999, you were advised

17  that your premiums were going to increase to

18  three hundred and seventy-five dollars; correct?

19      A    Yes, sir, that's what that says.

20      Q    And, again, in the fourth paragraph,

21  the second sentence, everyone with coverage such

22  as yours will experience an increase.

23  Therefore, your premium will increase to three

**TROY E. TILLERSON**

1    seventy-five on July 26, 1999; correct?

2        A    Yes.

3        Q    And we come down to the fifth paragraph

4    and it says, to limit the amount of increase or

5    possibly even lower your premium amount, you may

6    want to consider changing your benefit level;

7    correct?

8        A    Yes.

9        Q    And you've had that document in your

10   possession, as well as Exhibit 3, since they

11   were sent in 1998 and 1999; right?

12       A    Yes.

13       Q    I understand you may have -- Sue may be

14   handling your paperwork, but --

15       A    Right.  Right.

16       Q    -- she was the person --

17       A    Who provided the documents, so she had

18   them.

19       Q    Okay.  And I'm going to show you what

20   I'm going to mark as Exhibit 5 to your

21   deposition.  We'll make this -- it's two pages.

22   It's TI300044 and 45.  I think I put this

23   exhibit on the wrong piece of paper.

TROY E. TILLERSON

1

2      (Whereupon, Defendants' Exhibit

3   Number 5 was marked for identification

4   and copy of same is attached hereto.)

5

6      Q    This is a June 28, 1999 letter to you;

7   correct?

8      A    Yes, sir, it's addressed to me.

9      Q    Okay.  And it says as -- first

10  paragraph says, as requested, we've changed your

11  preferred provider organization plan to Plan D,

12  effective July 26, 1999; correct?

13     A    Yes.

14     Q    The enclosed documents reflect the

15  change.  Please keep them with your certificate

16  for future reference.  Then it says, due to this

17  change, your total monthly premium is now two

18  hundred and sixty-nine dollars; correct?

19     A    Yes.

20     Q    And the enclosed document appears to be

21  an endorsement that says, preferred provider

22  organization plan option has been changed to

23  Plan D.  All other benefits have been changed

**TROY E. TILLERSON**

1　accordingly.　The schedule of benefits

2　reflecting the change is effective July 26,

3　1999; correct?

4　　　A　　Correct.

5　　　Q　　And you've had that document in your

6　possession since sometime in 1999?

7　　　A　　Yes, sir.

8　　　Q　　I'll show you what I'm going to mark as

9　Exhibit 6 to your deposition, which consists of

10　TI300051 and 52.

11

12　　　(Whereupon, Defendants' Exhibit

13　Number 6 was marked for identification

14　and copy of same is attached hereto.)

15

16　　　A　　(Witness reviews document.)

17　　　Q　　This is a letter dated December 20,

18　1999 to you?

19　　　A　　Yes, sir.

20　　　Q　　Okay.　And this reflects that your

21　premium is going to increase to three hundred

22　and thirty-one dollars; correct?

23　　　A　　Yes.

TROY E. TILLERSON

1    Q    And, again, if we come down to the
2  fourth paragraph it says, everyone with coverage
3  such as yours will experience an increase.
4  Therefore, your premium will increase to three
5  hundred and thirty-one dollars on January 6,
6  2000?
7    A    Correct.
8    Q    And, again, the fifth paragraph, to
9  limit the amount of the increase or possibly
10  even lower your premium amount, you may want to
11  consider changing your benefit level; correct?
12    A    Correct.
13    Q    And you've had that document in your
14  possession since late 1999; correct?
15    A    Yes.
16    Q    I'll show you what I'm going to mark as
17  Exhibit 7 to your deposition, which consists of
18  TI300053.  And, apparently, we didn't get the
19  second page on this one.  But the first page is
20  what I need.
21
22      (Whereupon, Defendants' Exhibit
23  Number 7 was marked for identification

**TROY E. TILLERSON**

1    and copy of same is attached hereto.)

2         MR. COUCH:  And by the way, James, are

3    those Bates stamp numbers from my office or your

4    office?

5         MR. LAMPKIN:  They're from my office.

6         MR. COUCH:  Okay, good.  Because the

7    thing I handed you this morning in supplement

8    didn't have a stamp like that.

9         MR. LAMPKIN:  The three tells me

10   they're from -- who they're from, the three at

11   the first.  Because ours -- the ones we produced

12   had a zero, so that tells me they're from you.

13        MR. COUCH:  Okay.  Got you.

14   Q    Mr. Tillerson, this is a -- and I'll

15   tell you what.  Let's just attach TI300056 and

16   57, which is the same letter.  We'll just make

17   that part of Exhibit 3 since it does have both

18   pages.  This is a letter dated June 19, 2000;

19   correct?

20   A    Yes.

21   Q    And it's to you; right?

22   A    Yes.

23   Q    This is advising you that your premium

**TROY E. TILLERSON**

1    is going up to three hundred and fifty-three

2    dollars; correct?

3        A    Yes.

4

5        (Whereupon, a brief interruption was

6    had in the proceeding.)

7

8        Q    If you come down, you see a little

9    table there.  It's got current rate and new

10   rate; correct?

11       A    Correct.

12       Q    Then it -- in the sentence below that

13   it says, your new billing amount will be

14   increasing to three hundred fifty-three dollars

15   on July 26, 2000; right?

16       A    Yes.

17       Q    Is that 7?

18           MR. COUCH:  He was asking if that's

19   Number 7.

20       A    Oh, yes, yes, yes.

21       Q    And you've had that document in your

22   possession since sometime in 2000?

23       A    Yes, sir.

**TROY E. TILLERSON**

1    Q    I'll show you what I'm going to mark as

2    the next exhibit.  This will be Exhibit 8 to

3    your deposition.  It is two pages Bates labeled

4    TI300059 and 60.

5

6        (Whereupon, Defendants' Exhibit

7    Number 8 was marked for identification

8    and copy of same is attached hereto.)

9

10    Q    Is that a letter dated to you December

11    26, 2000, Mr. Tillerson?

12    A    Yes.

13    Q    And that document letter is advising

14    you that your premiums are going to go up to

15    three hundred and sixty-seven dollars a month;

16    correct?

17    A    Yes.

18    Q    And, again, if we come down to the

19    fourth paragraph it says, everyone with coverage

20    such as yours will experience an increase.

21    Therefore, your premiums will increase to three

22    hundred and sixty-seven dollars on June 26,

23    2000?

TROY E. TILLERSON

1       A       Yes.

2       Q       2001.  I'm sorry.  Correct?

3       A       Correct.

4       Q       And you've had that document in your

5   possession since late December 2000?

6       A       Yes.

7       Q       I'll show you the next exhibit, which

8   is TI300062, and we're going to mark it as

9   Exhibit 9.

10

11      (Whereupon, Defendants' Exhibit

12  Number 9 was marked for identification

13  and copy of same is attached hereto.)

14

15      Q       Is that a letter to you dated June 25,

16  2001?

17      A       Yes.

18      Q       And that letter is advising you your

19  premiums are going to increase to three hundred

20  and seventy-eight dollars a month?

21      A       Yes, sir.

22      Q       And, again, the fourth paragraph of the

23  letter says, everyone with coverage such as

**TROY E. TILLERSON**

1    yours will experience an increase.  Therefore,

2    your premium will increase to three hundred and

3    seventy-eight dollars on July 26, 2001; correct?

4        A    Yes.

5            MR. LAMPKIN:  Again, let's just go on

6    and make TI300065 and 66 part of Exhibit 9.

7    It's the same letter.  I just didn't have the

8    back page with that first one.  Will you check

9    it and see?

10            MR. COUCH:  I trust you.

11       Q    Mr. Tillerson, I'm going to show you

12   the next exhibit, which is -- on the wrong page

13   again.  It's going to be Exhibit 10 to your

14   deposition, which consists of documents Bates

15   labeled 30069 (sic) through 70.

16

17       (Whereupon, Defendants' Exhibit

18   Number 10 was marked for identification

19   and copy of same is attached hereto.)

20

21       A    (Witness reviews document.)

22       Q    Is that a letter to you dated December

23   24, 2001?

TROY E. TILLERSON

1    A    Yes, sir.

2    Q    And that letter is advising you your

3    premiums are going to increase to four hundred

4    and nine dollars; correct?

5    A    Correct.

6    Q    And, again, the fourth paragraph says,

7    everyone with coverage such as yours will

8    experience an increase.  Therefore, your premium

9    will increase to four hundred and nine dollars

10   on January 26, 2002?

11   A    Correct.

12   Q    And you've had that document in your

13   possession since late 2001 or early 2002?

14   A    Yes, sir.

15

16   (Whereupon, Defendants' Exhibit

17   Number 11 was marked for identification

18   and copy of same is attached hereto.)

19

20   Q    Let me show you Exhibit 11 to your

21   deposition, which are documents Bates labeled

22   TI300073 through 74.  No.  Just 73.  I'm sorry.

23   I don't have the other page.

**TROY E. TILLERSON**

1    A    (Witness reviews document.)

2    Q    Is that a letter dated to you -- to you

3    dated June 24, 2002?

4    A    Yes, sir.

5    Q    And that's advising you the premium is

6    going to increase to four hundred and

7    fifty-eight dollars; is that correct?

8    A    Yes, sir.

9    Q    You see where it says -- the

10   handwriting on that above the exhibit label?  Do

11   you know whose handwriting that is?

12   A    I would have to assume it was Sue's.  I

13   do not know.  It's not mine.

14   Q    And it says fee schedule; right?

15   A    I believe so.

16   Q    That's what it appears to be to me.

17   A    Right.

18   Q    Okay.  If we come down to the fourth

19   paragraph again -- the fourth paragraph of

20   Exhibit 11 it says, everyone with coverage such

21   as yours will experience an increase.

22   Therefore, your premium will increase to four

23   hundred and fifty-eight dollars on July 26,

1  2002; correct?

2      A      Correct.

3

4      (Whereupon, Defendants' Exhibit

5  Number 12 was marked for identification

6  and copy of same is attached hereto.)

7

8      Q      Okay.  I'll show you what I'm going to

9  mark as Exhibit 12 to your deposition, which

10  consists of the pages right in front me,

11  TI300078 through 79.

12      A      (Witness reviews document.)

13      Q      Is that a letter to you dated December

14  26, 2002?

15      A      Yes, sir.

16      Q      And that letter is advising you that

17  your premiums will increase to four hundred and

18  eighty dollars; is that correct?

19      A      Yes, sir.

20      Q      And, again, the fourth paragraph says,

21  everyone with coverage such as yours will

22  experience an increase.  Therefore, your premium

23  will increase to four hundred and eighty dollars

**TROY E. TILLERSON**

```
 1    on January 26, 2003; correct?

 2        A    Correct.

 3        Q    Last one.  I'll show you two documents

 4    Bates labeled TI300087 through 88.

 5

 6        (Whereupon, Defendants' Exhibit

 7    Number 13 was marked for identification

 8    and copy of same is attached hereto.)

 9

10        Q    Is that a letter to you dated June 26,

11    2003?

12        A    Yes, sir.

13        Q    And this one is advising you that your

14    premiums will increase to five hundred and

15    thirty-one dollars; correct?

16        A    Yes, sir.

17        Q    Again, the fourth paragraph says,

18    everyone with coverage such as yours will

19    experience an increase.  Therefore, your billing

20    amount will increase to five hundred and

21    thirty-one dollars on June 26, 2003 ;correct?

22        A    Yes.

23        Q    Mr. Tillerson, you've -- according to
```

**TROY E. TILLERSON**

1    these records, it appears that you had your

2    first rate increase on -- in December of 1998.

3    Does that sound correct?

4        A    Yes, sir.

5        Q    Do you recall a rate increase before

6    then?

7        A    No, I don't recall it.

8        Q    Okay.  And since then, your premiums --

9    other than when you changed to Plan D in July of

10   1999, your premiums have increased; correct?

11       A    Correct.

12       Q    And that's -- they've gone from three

13   hundred and ten dollars a month, dropped down to

14   two hundred and sixty-nine dollars a month in

15   July 1999 when you changed plans; correct?

16       A    Correct.

17       Q    And then they started going up.  And

18   through July 26 of 2003, they have increased

19   from two hundred and sixty-nine dollars a month

20   to five hundred and thirty-one dollars a month;

21   correct?

22       A    Correct.

23       Q    And you were aware of those premium

**TROY E. TILLERSON**

1    increases; correct?

2        A    Correct.

3        Q    And you had been paying those premium

4    increases that whole time; correct?

5        A    Yes.  True.

6        Q    What evidence do you have that you were

7    singled out for any of those increases?

8            MR. COUCH:  Object to the form.

9        A    Like I said, I didn't know anything

10   about it until I talked to Mr. Couch here about

11   what was going on.  I mean, the letter said that

12   everybody was getting an increase, so I thought

13   that's what was going on.

14       Q    What evidence do you have that would

15   show that everyone wasn't getting an increase?

16           MR. COUCH:  Same objection.

17       A    Like I said, I -- my lawyer, Mr. Couch,

18   he's -- he informed me of everything and that

19   would be something you'd have to get from him, I

20   guess.

21       Q    You started -- I think we went over

22   with your hyperthyroid.  That was seven or eight

23   years ago, correct, that you were diagnosed?

**TROY E. TILLERSON**

1    increase due to your medical conditions?

2        A    Could you explain that a little

3    better?

4        Q    Sure.  Are you aware any facts that you

5    would say would prove that you received a rate

6    increase due to your claim history and your

7    medical condition?

8        A    I'm not aware of any facts to that

9    other than what I was explained by Mr. Couch,

10   so, no.

11       Q    Okay.  You are aware that since 1998,

12   other than whenever you dropped your change in

13   coverage down to a Plan D -- or to Plan D, that

14   your premium increases have gone up every six

15   months?

16       A    Yes.

17       Q    Your premiums have gone up every six

18   months?

19       A    Correct.

20       Q    And you've known that -- you knew that

21   each time you got a premium increase; right?

22       A    Yes.

23       Q    Tell me how you suffered any damage as

Pre-Existing Conditions are any Sickness or Injury not specifically excluded by name or description for which medical advice, consultation or treatment was recommended or received from a physician within the one year period prior to the effective date of coverage; or symptoms existed which would cause an ordinarily prudent person to seek diagnosis, care or treatment within the one year period before the effective date of coverage.

### Rehabilitative Services

We will not provide benefits for any service or supply provided to an Insured Person as an outpatient at a Hospital or other facility where the admission or treatment is primarily to provide Rehabilitation Services. Rehabilitation Services include physical, occupational, and speech therapy. Coverage for these services may be added by a rider.

# EFFECTIVE DATE OF COVERAGE

### Beginning of Coverage

We require evidence of insurability before coverage is provided. Once We have approved Your Enrollment Application based upon the information You provided therein, coverage for You and those dependents listed in the Enrollment Application and accepted by Us will begin on the Certificate Date shown in the Certificate Schedule.

### Newborn Children

If You have one or more Eligible Dependents covered under the Group Policy, Your newborn children will be provided coverage after the Certificate Date from the moment of birth for 31 days. To continue coverage beyond 31 days, You must send written notice directing Us to add the newborn child. This notice must be received by Us within 31 days of the newborn child's birth and must be accompanied by any required additional premium.

If no Eligible Dependents are covered under this plan at the time a child is born to the Insured, such newborn child will not be a Covered Dependent from the time of birth. Such child may only be added in accordance with the "Additional Dependents" provision below.

### Additional Dependents

You may add Eligible Dependents by providing evidence of eligibility and insurability satisfactory to Us and upon payment of any additional premium, if required.

The acceptance of a new Eligible Dependent will be shown by endorsement and the date of the endorsement will be the effective date of coverage for the new Eligible Dependent.

# PREMIUMS

### Due Date

Premiums are payable to Us at Our office at North Richland Hills, Texas. The premium is payable monthly, quarterly, semi-annually or annually. Payment of any premium will not maintain coverage in force beyond the next premium due date, except as provided by the Grace Period. Any indebtedness of the Insured Person to Us arising out of prior claims may be deducted in any settlement under the Group Policy.

### Grace Period

A grace period of 31 days, measured from the premium due date, will be allowed for payment of all premiums due, other than the first. During this time, the coverage will remain in force, unless We receive written notice that the coverage is to be terminated.

### Premium Changes

We reserve the right to change the table of premiums, on a class basis, becoming due under the Group Policy at any time and from time to time; provided, We have given the Group Policyholder written notice of at least 31 days prior to the effective date of the new rates.



DEFENDANT'S
EXHIBIT
2
T. Tillerson



T I 3 0 0 0 2 3

20

DUPLICATE